T.C. Memo. 2020-38

UNITED STATES TAX COURT

RONALD M. GOLDBERG, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 14294-13L.                    Filed April 2, 2020.

Ronald M. Goldberg, for himself.

<u>Michael T. Shelton</u>, for respondent.

CONTENTS

MEMORANDUM FINDINGS OF FACT AND OPINION . . . . . . . . . . . . . . . . . . 8

I.      Issues for decision . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

II.     The Form-4549-as-a-contract argument . . . . . . . . . . . . . . . . . . . . . . . . . 41

III.    Interest abatement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

[*2]   A.   The Goldbergs' 2004 income-tax return and the early stages of the examination of their 2004 income-tax return . . . . . . . . . . . . . . . . . . 55

B.   Period 1:  September 12-20, 2007 . . . . . . . . . . . . . . . . . . . . . . . . . 60

     1.   Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

     2.   Events  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

     3.   Analysis and holding . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

C.   Period 2:  September 20-27, 2007 . . . . . . . . . . . . . . . . . . . . . . . . . 63

     1.   Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

     2.   Events  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

     3.   Analysis and holding . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

D.   Intermediary period:  September 28 through November 30, 2007 . . 67

E.   Period 3:  December 1, 2007, through January 31, 2008 . . . . . . . . . 68

     1.   Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

     2.   Events  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

     3.   Analysis and holding . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

F.   Period 4:  January 31 through March 11, 2008 . . . . . . . . . . . . . . . . 71

     1.   Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

     2.   Events  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

**[*3]**   3.   Analysis and holding . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

G.   Period 5:  March 11 through April 28, 2008 . . . . . . . . . . . . . . . . . . 74

1.   Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

2.   Events  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

3.   Analysis and holding . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

H.   Intermediary period:  April 29 through July 17, 2008  . . . . . . . . . . . 78

I.   Period 6:  July 18-30, 2008 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

1.   Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

2.   Events  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82

3.   Analysis and holding . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82

J.   Intermediary period:  July 31 through August 7, 2008 . . . . . . . . . . . 83

K.   Period 7:  August 8-16, 2008 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84

1.   Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84

2.   Events  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85

3.   Analysis and holding . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

L.   Intermediary period:  August 17-26, 2008  . . . . . . . . . . . . . . . . . . . 88

M.   Period 8:  August 27 through September 4, 2008 . . . . . . . . . . . . . . . 88

1.   Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88

**[*4]**      2.     Events . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88

              3.     Analysis and holding . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

    N.     Period 9: September 4-22, 2008 . . . . . . . . . . . . . . . . . . . . . . . . . . 91

              1.     Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

              2.     Events . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92

              3.     Analysis and holding . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95

    O.     Period 10: September 23-25, 2008 . . . . . . . . . . . . . . . . . . . . . . . . 96

              1.     Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96

              2.     Events . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97

              3.     Analysis and holding . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98

    P.     Intermediary period: September 26-28, 2008 . . . . . . . . . . . . . . . . . 99

    Q.     Period 11: September 29 through November 13, 2008 . . . . . . . . . 100

              1.     Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100

              2.     Events . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100

              3.     Analysis and holding . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 103

    R.     Intermediary period: November 14, 2008, through
        May 28, 2009 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 105

    S.     Period 12: May 29 through June 8, 2009 . . . . . . . . . . . . . . . . . . 107

**[*5]** 1. Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 107

2. Events . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 107

3. Analysis and holding . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 109

T. Intermediary day: June 9, 2009 . . . . . . . . . . . . . . . . . . . . . . . . 111

U. Period 13: June 10-15, 2009 . . . . . . . . . . . . . . . . . . . . . . . . . . . 111

1. Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 111

2. Events . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 112

3. Analysis and holding . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 112

V. Intermediary period: June 16-19, 2009 . . . . . . . . . . . . . . . . . . . 115

W. Period 14: June 20 through July 27, 2009 . . . . . . . . . . . . . . . . . 116

1. Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 116

2. Events . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 117

3. Analysis and holding . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 118

X. Period 15: July 27, 2009, through August 9, 2010 . . . . . . . . . . . . 119

1. Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 119

2. Events . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 120

3. Analysis and holding . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 121

Y. Intermediary period: August 10 through November 14, 2010 . . . . 122

**[*6]**  Z.   Period 16:  November 15 through December 8, 2010. . . . . . . . . . . 122

        1.   Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 123

        2.   Events . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 124

        3.   Analysis and holding. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 124

   AA.   Period 17:  December 8, 2010, through January 3, 2011 . . . . . . . . 125

        1.   Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 125

        2.   Events . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 126

        3.   Analysis and holding. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 131

   BB.   Intermediary period:  January 4-6, 2011 . . . . . . . . . . . . . . . . . . . 133

   CC.   Period 18:  January 7-10, 2011 . . . . . . . . . . . . . . . . . . . . . . . . . 134

        1.   Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 134

        2.   Events . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 134

        3.   Analysis and holding. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 136

   DD.   Intermediary period:  January 11-12, 2011 . . . . . . . . . . . . . . . . . 137

   EE.   Period 19:  January 13 through February 15, 2011. . . . . . . . . . . . . 137

        1.   Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 137

        2.   Events . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 138

        3.   Analysis and holding. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 139

**[*7]** FF. Intermediary period: February 16 through March 28, 2011 . . . . . 140

GG. Period 20: March 29 through April 15, 2011 . . . . . . . . . . . . . . . . . 141

    1. Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 141

    2. Events . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 142

    3. Analysis and holding . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 143

HH. Intermediary period: April 16-28, 2011 . . . . . . . . . . . . . . . . . . . . 144

II. Period 21: April 29 through August 23, 2011 . . . . . . . . . . . . . . . 145

JJ. Period 22: August 24, 2011, through June 26, 2013 . . . . . . . . . . . 147

    1. Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 147

    2. Events . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 147

        a. Final notice of intent to levy and Goldberg's claim for interest abatement . . . . . . . . . . . . . . . . . . . . . . . . 148

        b. Contact with Taxpayer Advocate Service . . . . . . . . . 149

        c. IRS files notice of lien . . . . . . . . . . . . . . . . . . . . . . . 150

        d. Collection-due-process proceedings . . . . . . . . . . . . . 151

        e. Notice of determination . . . . . . . . . . . . . . . . . . . . . . 153

    3. Analysis and holding . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 155

        a. Whether remand is appropriate . . . . . . . . . . . . . . . . . 156

**[\*8]**          b.     Whether Goldberg is entitled to interest abatement . . 158

IV.   Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 162

MEMORANDUM FINDINGS OF FACT AND OPINION

MORRISON, <u>Judge</u>:  On November 1, 2012, the respondent (referred to here as the IRS) issued to the petitioner, Mr. Ronald M. Goldberg, a notice that it had filed a notice of lien on his property to help collect his 2004 income-tax liabilities.  Goldberg timely requested a collection-due-process hearing, also known as a CDP hearing.  The IRS Office of Appeals held the hearing and issued a determination sustaining the lien-notice filing.  Goldberg filed a timely petition with this Court.  When he filed his petition, Goldberg was a resident of Illinois. The Court remanded the case to the Office of Appeals for it to consider Goldberg's claims for interest abatement.  After a supplemental hearing, the Office of Appeals issued a supplemental determination rejecting Goldberg's claims for interest abatement.  The Court then held a trial.  Our jurisdiction over this case is established by section 6330(d)(1).[1]

---

[1]Unless otherwise indicated, all references to sections are to the Internal Revenue Code of 1986, as amended and in effect at the relevant times.  All

(continued...)

**[*9]**   Our opinion addresses Goldberg's arguments that the Office of Appeals made various errors in its determination and supplemental determination.  The IRS conceded on post-trial brief that Goldberg is entitled to interest abatement for the period from April 29 through August 23, 2011 (Period 21).  Because of this concession, we hold that Goldberg is entitled to interest abatement for that period.  Other than that, we sustain the Office of Appeals' determination, as supplemented.

This opinion is divided into four parts.  In part I, we determine what issues to resolve in this case.  We conclude that we will resolve only two issues:  (1) whether the Form 4549, "Income Tax Examination Changes", prepared by the IRS in April 2011 and signed by Goldberg and his wife in May 2011 (which we refer to as the May 2011 Form 4549) was a binding contract between the IRS and the Goldbergs under which the Goldbergs owed no interest for the 2004 tax year and (2) whether Goldberg is entitled to abatement of interest under section 6404(e)(1).  We resolve the first issue in part II, holding that the May 2011 Form 4549 is not a binding contract under which the Goldbergs owed no interest for 2004, and the second issue in part III, holding that Goldberg is not entitled to abatement of interest except for the period stated above.  In part IV, we conclude the opinion by

---

[1](...continued)
references to Rules are to the Tax Court Rules of Practice and Procedure.

**[*10]** summarizing our holding that the notice of determination is sustained, as supplemented, with the exception of the conceded period (Period 21).

I.    Issues for decision

In this part we determine what issues are to be resolved by the Court.  For an initial cut of what issues are to be resolved, we consult Goldberg's briefs.  That is because, as a general rule, a party must raise an issue on brief for the issue to be properly raised for the Court's consideration.  Rule 151(e)(4) and (5).  Goldberg makes the following six arguments:

First, Goldberg argues that his income-tax liability for 2004 must be determined by a stipulation of settled issues in Captain Douglas J. Brown, Inc. v. Commissioner, T.C. Dkt. No. 30453-08 (Apr. 29, 2011).  As we explain below, though, we have already considered and rejected his argument in a prior order. See infra pt. I, pp. 37-38.

Second, Goldberg argues that the May 2011 Form 4549 is a binding contract under which the Goldbergs owe no interest for the 2004 tax year.  We consider this argument to be properly before the Court.  See infra pt. I, pp. 38-39.

Third, Goldberg argues that the May 2011 Form 4549 entitles him to relief under a theory of promissory estoppel.  As we explain below, though, this issue is not properly before the Court.  See infra pt. I, pp. 39-40.

**[*11]** Fourth, Goldberg argues that the May 2011 Form 4549 equitably estopped the IRS from assessing interest on his 2004 income-tax liability. As we explain below, though, this issue is not properly before the Court. See infra pt. I, pp. 39-40.

Fifth, Goldberg argues that the May 2011 Form 4549 should be voided because he and his wife were induced to sign it through fraud or misrepresentation. As we explain below, though, this issue is not properly before the Court. See infra pt. I, pp. 39-40.

Sixth, Goldberg argues that he is entitled to abatement of interest under section 6404(e)(1). As we explain below, this issue is properly before the Court. See infra pt. I, p. 39.

Goldberg's arguments involve various legal principles. Over the next few pages we discuss these legal principles generally. See infra pt. I, pp. 11-19. A good starting point is the principle that the IRS cannot collect a tax until it has made an assessment of the tax. See sec. 6502(a) (assessment is precondition for imposing levy); sec. 6322 (assessment results in lien); Jordan v. Commissioner, 134 T.C. 1, 12 (2010), supplemented by T.C. Memo. 2011-243; 1 Gerald A. Kafka, Rita A. Cavanagh & Sean M. Akins, Litigation of Federal Civil Tax Controversies, para. 3.01, at 3-2 (2d ed. 2016) ("No tax may be collected by the

[*12] Service until after it has been assessed."); 1 Laurence F. Casey, Federal Tax Practice, sec. 2.01, at 2-3 to 2-4 (Supp. 2019). The authority of the IRS to assess is subject to statutory restrictions designed to protect taxpayers. Under section 6501(a), the IRS cannot assess tax more than three years after the return was filed.[2] Under section 6213(a), the IRS cannot assess a deficiency--generally the amount of unreported tax--unless the IRS first mails the taxpayer a notice of deficiency. See sec. 6211(a) (defining "deficiency" as the correct tax, minus the tax reported, with certain exceptions not relevant here). The notice of deficiency gives the taxpayer the right to file a Tax Court petition to redetermine the amount of the deficiency. Secs. 6213(a), 6214(a).

At the close of an IRS examination, the revenue agent commonly prepares a report of the examination's findings. A Form 4549 is sometimes used for this report (or for a portion of the report). The Form 4549 has spaces for the revenue agent to enter the taxes, penalties, and interest determined as a result of the IRS examination. The form is worded such that if the taxpayer signs the form, the taxpayer agrees to the immediate assessment and collection of any increase to taxes and penalties therein, plus the interest statutorily imposed on them. Thus, a

---

[2]But if the return was filed early, the three-year period starts with the due date of the return. Sec. 6501(b)(1).

**[\*13]** taxpayer signing the Form 4549 waives the section 6213(a) prohibition on the IRS's assessing a tax deficiency without the mailing of a notice of deficiency. See sec. 6213(d) (stating that taxpayers may waive restrictions on assessment provided in sec. 6213(a)). A taxpayer signing the Form 4549 also waives "appeal rights with the Internal Revenue Service" and the right "to contest in the United States Tax Court the findings in this report." See Aguirre v. Commissioner, 117 T.C. 324, 327 (2001).

Assessment of tax by the IRS automatically creates a lien on the taxpayer's property in favor of the United States. Sec. 6322. To establish the priority of the tax lien against certain other types of creditors, the IRS may file a notice of lien. Sec. 6323(a), (f). After filing a notice of lien, the IRS is required to give notice to the taxpayer giving the taxpayer the right to a CDP hearing with the Office of Appeals. Sec. 6320(a)(1), (3). Both the lien and the notice of lien assist the IRS in collecting the tax.

The IRS can collect an assessed tax by levy. Secs. 6502(a), 6331(a). Before it makes the levy, the IRS must give the taxpayer notice of the proposed levy. Sec. 6330(a)(1), (b)(1). This notice gives the taxpayer the right to request a CDP hearing. Id. A CDP hearing, whether held in conjunction with a levy or the filing of a notice of lien, is governed by section 6330(c). See sec. 6320(c). Section

**[\*14]** 6330(c) sets forth the matters to be considered at the CDP hearing. Sec. 6320(c). Section 6330(c)(2)(B) provides that the taxpayer may raise at the hearing challenges to the existence or amount of the underlying tax liability the IRS is seeking to collect if the taxpayer did not receive a notice of deficiency or did not otherwise have an opportunity to dispute such tax liability. Sec. 6320(c).

After a CDP hearing, the Office of Appeals makes a determination. See sec. 6330(c)(3). Section 6330(d)(1) provides that the person may file a Tax Court petition within 30 days of the notice of determination. The Tax Court then has jurisdiction to review the determination. Id.

In appropriate circumstances, the Tax Court may remand a CDP case to the Office of Appeals for it to make a supplemental determination. The Tax Court has jurisdiction to review the determination as supplemented. See LG Kendrick, LLC v. Commissioner, 146 T.C. 17, 36 (2016), aff'd, 684 F. App'x 744 (10th Cir. 2017); Kelby v. Commissioner, 130 T.C. 79, 87-88 (2008).

Section 6601(a) provides that interest accrues on any underpayment of tax. Interest begins to accrue on the date that payment was due. Section 6601(g) provides that interest "may be assessed and collected at any time during the period within which the tax to which such interest relates may be collected." Under section 6502(a)(1), the period of limitations on the collection of tax begins on the

[*15] date the IRS assesses the tax. Section 6502(a)(1) and section 6601(g) in combination form the following rule: the assessment of interest may occur only after the assessment of "the tax to which such interest relates". See also Field v. United States, 381 F.3d 109, 113 (2d Cir. 2004) ("Since the IRS's assessment of interest against * * * [the taxpayer-plaintiff] coincided with the commencement of the collection period, the assessment [of the interest] was no doubt timely."); Priv. Ltr. Rul. 201319017 (May 10, 2013) ("[T]he Service cannot assess additional interest on * * * [a] tax liability that was never actually assessed."). By executing a Form 4549, a taxpayer consents to the immediate assessment and collection of the tax and the interest to which the tax relates. Aguirre v. Commissioner, 117 T.C. at 327.

Section 6404(e)(1) provides that the IRS may abate assessed interest under certain conditions that we discuss infra part III. Section 6404(e)(2) provides that the IRS may abate interest under other conditions not relevant to this case. Section 6404(h)(1) provides that the Tax Court has jurisdiction over any action brought by a taxpayer to determine whether the IRS's failure to abate interest under section 6404(e), including section 6404(e)(1), was an abuse of discretion. Two prerequisites for jurisdiction under section 6404(h)(1) are (1) the taxpayer's net worth must not exceed the relevant ceiling, and (2) the action must be brought

**[*16]** within 180 days after the date of the mailing of the IRS's final determination not to abate interest.

As we observed above, in a CDP hearing a taxpayer is permitted to bring a challenge to the existence and amount of the underlying tax liability the IRS is seeking to collect through the levy (or the lien-notice filing) that triggered the CDP hearing. See sec. 6330(c)(2)(B). If the IRS is seeking to collect interest, then the taxpayer in a CDP hearing can challenge the liability for interest. Urbano v. Commissioner, 122 T.C. 384, 390 (2004); Montgomery v. Commissioner, 122 T.C. 1, 8 (2004). A challenge to liability for interest can be premised on the interest-abatement provisions of section 6404(e)(1). See Urbano v. Commissioner, 122 T.C. at 390; Katz v. Commissioner, 115 T.C. 329, 339 (2000).

The regulations interpreting section 6330 provide that a "taxpayer can only ask the court to consider an issue, including a challenge to the underlying tax liability, that was properly raised in the taxpayer's CDP hearing." Sec. 301.6330-1(f)(2), Q&A-F3, Proced. & Admin. Regs. An issue is properly raised if the taxpayer requests consideration of the issue by the Office of Appeals and presents evidence with respect to that issue after being given a reasonable opportunity to present such evidence. Id.; see also Giamelli v. Commissioner, 129 T.C. 107, 114-115 (2007).

**[\*17]**  In evaluating a determination by the Office of Appeals after a CDP hearing, the Court's general standard of review for evaluating challenges to the underlying tax liability is de novo.  Goza v. Commissioner, 114 T.C. 176, 181-182 (2000); see also Perkins v. Commissioner, 129 T.C. 58 (2007); Downing v. Commissioner, 118 T.C. 22, 29 (2002).  The underlying tax liability is the liability the IRS is seeking to collect through the collection action that triggered the taxpayer's right to request a CDP hearing.  Klein v. Commissioner, 149 T.C. 341, 348-349 (2017).  Thus, if the IRS is seeking to collect interest, then interest is the underlying liability.  A taxpayer's challenge to its underlying tax liability is generally reviewed de novo.  Urbano v. Commissioner, 122 T.C. at 393.  This rule admits of an exception when the taxpayer's challenge to interest liability is premised on the interest-abatement provisions of section 6404(e)(1).  In such an instance, we have reviewed the determination of the Office of Appeals for abuse of discretion.  See Downing v. Commissioner, 118 T.C. at 30; Krehnbrink v. Commissioner, T.C. Memo. 2019-56, at \*17, appeal filed (6th Cir. Aug. 26, 2019); Estate of La Sala v. Commissioner, T.C. Memo. 2016-42, at \*16-\*17.  Reviewing for abuse of discretion in that instance appropriately reflects the wording of section 6404(e)(1), which provides that the Secretary of the Treasury "may" abate an assessment of interest if the conditions named in section 6404(e)(1) are met.  The word "may"

[*18] signifies that Congress has conferred discretion on the Secretary of the Treasury. Cf. Porter v. Commissioner, 132 T.C. 203, 206-208 (2009), abrogating Butler v. Commissioner, 114 T.C. 276 (2000); see also id. at 237-238 (Gustafson, J., dissenting).

In CDP cases with the exception of those cases appealable to the Court of Appeals for the First, Eighth, or Ninth Circuit, the Tax Court employs a de novo scope of review. Robinette v. Commissioner, 123 T.C. 85, 101 (2004), rev'd, 439 F.3d 455 (8th Cir. 2006); Golsen v. Commissioner, 54 T.C. 742, 757 (1970) (holding Tax Court follows precedent of circuit to which case would be appealable to extent precedent is "squarely in point"), aff'd, 445 F.2d 985 (10th Cir. 1971); Murphy v. Commissioner, 469 F.3d 27, 31 (1st Cir. 2006), aff'g 125 T.C. 301 (2005); Robinette v. Commissioner, 439 F.3d 455, 459 (8th Cir. 2006), rev'g 123 T.C. 85, 101 (2004); Keller v. Commissioner, 568 F.3d 710, 718 (9th Cir. 2009), aff'g in part T.C. Memo. 2006-166, and aff'g in part, vacating in part decisions in related cases. Goldberg resided in Illinois when he filed his petition. Therefore our decision will not be appealable to the First, Eighth, or Ninth Circuit. See sec. 7482(a)(1), (b)(1). Therefore, we employ a de novo scope of review. Applying a

**[\*19]** de novo scope of review means that the Court considers evidence not in the administrative record.[3] Robinette v. Commissioner, 123 T.C. at 101.

In a Tax Court proceeding, the taxpayer has the burden of proof. Rule 142(a).

We now explain the procedural history of this case relevant to determining what issues are properly before the Court.[4]

Goldberg and his wife filed joint income-tax returns for 2003 and 2004. They reported that they owed no tax for either year.

In 2007 the IRS began an examination of the Goldbergs' 2003 and 2004 returns. Revenue Agent Julie Knighton performed the examination. We refer to her as RA Knighton.

On May 11, 2011, the examination ended with RA Knighton's preparing a Form 4549, "Income Tax Examination Changes", and the Goldbergs' signing the

---

[3]In cases where our jurisdiction is granted by sec. 6404(h)(1), we apply a de novo scope of review. See, e.g., Goettee v. Commissioner, T.C. Memo. 2003-43, supplemented by T.C. Memo. 2004-9, aff'd, 192 F. App'x 212 (4th Cir. 2006); Jean v. Commissioner, T.C. Memo. 2002-256; Jacobs v. Commissioner, T.C. Memo. 2000-123; see also Porter v. Commissioner, 130 T.C. 115, 122-123 (2008) (noting de novo scope of review for cases brought under sec. 6404(h)(1)).

[4]The discussion of the procedural history that follows includes some of our findings of fact. The Court also adopts the parties' stipulation of facts as findings of fact. Other findings of fact are stated infra part III, in which we discuss Goldberg's entitlement to interest abatement under sec. 6404(e)(1).

[*20] form.  We have referred to this as the May 2011 Form 4549.  There were

prior drafts of this Form 4549, but these drafts are not relevant to what issues are

properly before the Court.  Therefore these drafts are not discussed in this part of

the opinion regarding which issues are properly before the Court.  These drafts are

relevant to Goldberg's entitlement to interest abatement under section 6404(e)(1).

They are discussed infra part III.EE, which is the part of the opinion in which we

discuss Goldberg's entitlement to interest abatement under section 6404(e)(1) for

the period of January 13 through February 15, 2011 (Period 19).

The May 2011 Form 4549 had pre-printed lines to show the following three

amounts due for each tax year:  (1) tax, (2) penalties, and (3) interest.  For each tax

year the tax due was shown on line 19.a, the penalties due were shown on line

19.b, and the interest due was shown on line 19.c.  For 2003, line 19.a showed the

tax due as $10,557; line 19.b (for penalties) was blank; and line 19.c showed the

interest due "computed to 05/29/2011" as zero (specifically "0.00").  The sum of

all three amounts due was shown as $10,557.  For 2004, line 19.a showed the tax

due as $46,865; line 19.b (for penalties) was blank; and line 19.c showed the

interest due "computed to 05/29/2011" as zero (specifically "0.00").  The sum of

all three amounts due was shown as $46,865.  Below these amounts was the name

[*21] of the revenue agent, RA Knighton.  Below that, the Goldbergs signed the following statement:

> I give my consent to the immediate assessment and collection of any increase in tax and penalties, and accept any decrease in tax and penalties shown above, plus additional interest as provided by law.  It is understood that this report is subject to acceptance by the Area Director, Area Manager, Specialty Tax Program Chief, or Director of Field Operations.

The statement is a consent to the immediate assessment of the taxes and penalties shown on the form.  See Evans v. Commissioner, T.C. Memo. 1999-66, slip op. at 10 ("By executing the Form 4549, petitioner merely consented to the immediate assessment and collection of the deficiency proposed therein." (Emphasis added.)).  In its opening brief, the IRS argues that the statement should also be interpreted as a consent to the assessment of interest on the Goldbergs' 2004 income-tax liability.  The IRS's explanation is as follows:

> Accordingly, while petitioner's consent to the assessment of tax and penalties was limited to the dollar amounts "shown above" on the Form 4549, petitioner's consent to the assessment of interest was not limited to the dollar amounts "shown above" on the Form 4549.  To the contrary, petitioner agreed that interest would be assessed "as provided by law."

Goldberg argues that the May 2011 Form 4549 was a contract, and that under the terms of the alleged contract, he owed no interest because of the 0.00 entered in the line for interest.  He does not directly address the legal effect of the

**[\*22]** terms "shown above" or "as provided by law".[5]  However, he has other arguments about the legal effect of the May 2011 Form 4549 (i.e., his third, fourth, and fifth arguments referred to <u>supra</u> part I, pp. 10-11).

The $46,865 of tax shown for 2004 on the May 2011 Form 4549 resulted from various adjustments to the Goldbergs' income asserted in the May 2011 Form 4549.  One of these adjustments was an increase in income related to the Goldbergs' S corporations' participation in a Niche section 419A plan and a Greater Metropolitan Benefits plan.

On August 1, 2011, the IRS issued the Goldbergs a notice that it had assessed them interest for tax year 2004 in the amount of $20,210.27.

On August 23, 2011, the Goldbergs paid $50,000 to the IRS.  The $50,000 payment was applied in part against the non-interest component of their 2004 tax liability (and completely eliminated the non-interest component of their 2004 tax liability).  The remainder of the $50,000 was applied to reduce (but not eliminate) the balance of the $20,210.27 of assessed interest for 2004.

---

[5]Our view of the significance of the statement from the May 2011 Form 4549 excerpted above is explained <u>infra</u> part II.

[*23] On September 5, 2011, the IRS mailed Goldberg a Letter 1058, "Final Notice of Intent to Levy and Notice of Your Right to a Hearing".[6] The letter was delivered to Goldberg on September 8, 2011. The letter stated that the IRS intended to levy to collect from Goldberg for his and his wife's joint income-tax liabilities for 2003 and 2004. For 2004, the letter stated that the amounts sought to be collected were an assessed balance of $67,075.27, accrued interest of $486.90, and a late payment penalty of $436.86. These three amounts totaled $67,999.03. The computations of these amounts apparently did not take into account the Goldbergs' $50,000 payment described in the paragraph above.

The September 5, 2011 Letter 1058 offered Goldberg an opportunity to request a CDP hearing. Attached to the Letter 1058 was a Form 12153, "Request for a Collection Due Process or Equivalent Hearing", which can be used to request a CDP hearing. Goldberg did not return the Form 12153 to the IRS.

Instead, on or around September 9, 2011, Goldberg filed a Form 843, "Claim for Refund and Request for Abatement". In the Form 843, Goldberg stated that there had been managerial delays during the examination. He checked the box labeled "Interest was assessed as a result of IRS errors or delays", which is

---

[6]This September 5, 2011 mailing of the Letter 1058 and all events from August 24, 2011, through June 26, 2013, are detailed infra part III.JJ.2 (Period 22).

[*24] essentially a box for taxpayers to check to assert that they are entitled to interest abatement under section 6404(e)(1). In addition to his claim for interest abatement, Goldberg contended that the income adjustment in the May 2011 Form 4549 regarding the Niche section 419A and Greater Metropolitan Benefits plans was in error because it was contrary to the April 29, 2011 stipulation of settled issues in the Tax Court case Captain Douglas J. Brown, Inc., a consolidated case involving deficiency actions by 121 petitioners. See Stipulation of Settled Issues at Ex. A, Captain Douglas J. Brown, Inc. v. Commissioner, T.C. Dkt. No. 30453-08. Neither of the Goldbergs was among those petitioners, see id., and Rule 91(e) provides such stipulations "shall be binding and have effect only in the pending case and not for any other purpose". The IRS eventually denied the claims made on the Form 843 that Goldberg filed.[7] Neither party argues that the Form 843 filed by Goldberg constituted a request for a CDP hearing. Our resolution of the case does not depend on whether the Form 843 constituted a request for a CDP hearing.

On October 30, 2012, the IRS filed a notice of lien with Lake County, Illinois, against Goldberg's property. According to the notice of lien, its purpose

---

[7]We detail the denial and the events surrounding the denial (in the May 28, 2013 notice of determination) in Period 22, infra part III.JJ.2.e.

[*25] was to secure collection of a $17,071.22 unpaid balance of Federal income-tax liabilities for 2004. This amount appears to be the balance of the unpaid interest that had accrued on the Goldbergs' 2004 underpayment less a portion of the Goldbergs' $50,000 payment that they had made on August 23, 2011. The lien-notice filing is discussed in more detail in Period 22, infra part III.JJ.2.c.

On November 1, 2012, the IRS sent a notice to Goldberg that it had filed the notice of lien on October 30, 2012. This notice gave Goldberg another opportunity to request a CDP hearing with the Office of Appeals.

On November 14, 2012, Goldberg used a Form 12153 to timely request a CDP hearing in response to the November 1, 2012 lien-filing notice.[8] In the request, Goldberg contended that he was entitled to abatement of interest because of alleged unreasonable errors and delays by the IRS in processing his Form 843. Goldberg described the alleged unreasonable errors or delays in processing his Form 843 thus:

> * * * [Goldberg] filed the [Form] 843 at the recommendation of the
> * * * [IRS] in September of 2011. * * * [Goldberg] also filed a
> request for abatement [of interest] at the direction of the * * * [IRS]
> as * * * [the Goldbergs] had a contract which stated "zero interest".
> The * * * [Goldbergs] received several letters from [the IRS's]
> collections [unit] stating over and over that it needed more time to
> process [Goldberg's] request. * * *

---

[8]This hearing is discussed in more detail in Period 22, infra part III.JJ.2.d.

[*26] *      *      *      *      *      *      *

> [I]n October 2012, almost 13 months later * * * [Goldberg's Form]
> 843 was answered by * * * [an] Interest Abatement Coordinator * * *

Thus, the request for interest abatement in the Form 12153 appeared to correspond to the interest accruing after the date that Goldberg submitted his Form 843 to the IRS (on or around September 9, 2011). Goldberg also contended in the Form 12153 that the income adjustment in the May 2011 Form 4549 regarding the Niche section 419A plan was in error because the adjustment was inconsistent with the stipulation of settled issues in Captain Douglas J. Brown, Inc. As a result of this error, Goldberg contended in the Form 12153, there was no deficiency for 2004 and there was no interest for 2004. In addition, Goldberg contended in the Form 12153 that the IRS had agreed, as a result of the "0.00" on line 19.c of the May 2011 Form 4549, that there was no interest liability for tax year 2004. In this Form 12153, Goldberg did not refer to the adjustments relating to the Greater Metropolitan Benefits plan.

Goldberg's CDP hearing was handled by Marcus Morgan, an Appeals officer.

On May 28, 2013, the Office of Appeals issued a notice of determination regarding the CDP hearing concerning the notice of lien filing. The notice of

**[\*27]** determination rejected Goldberg's argument that the "0.00" amount on line 19.c of the May 2011 Form 4549 fixed the interest due for 2004 at zero. Addressing Goldberg's interest-abatement claim, the notice of determination stated:

> You also advised that you filed an abatement of interest claim via Form 843, but you really filed an abatement of tax claim (as confirmed by reviewing the form). The interest abatement unit confirmed that they closed the case because abatement of interest was not at issue.

The notice of determination thus characterized Goldberg's Form 843 interest-abatement claim as a tax-abatement claim and denied him relief. Because the notice characterized his Form 843 claim as tax-abatement claim, it seems to have declined to address the merits of his claim for interest abatement under section 6404(e). Nor did the notice of determination specifically address the <u>Captain Douglas J. Brown, Inc.</u> argument. However, the notice of determination did state that Goldberg was generally precluded from disputing his "liability" in the CDP hearing because he had already had a prior opportunity to do so when he received the Letter 1058.

On June 26, 2013, Goldberg filed a timely petition for the Court to review the May 28, 2013 determination of the Office of Appeals.

[*28] The IRS moved to remand the case to the Office of Appeals. The motion stated that the Office of Appeals had erroneously refused to consider whether Goldberg was entitled to interest abatement. On December 17, 2013, the Court granted the motion and remanded the case to the Office of Appeals to make a supplemental determination. On remand, Appeals Officer Kathy Keen was assigned by the Office of Appeals to handle the hearing.

After the case was remanded, Goldberg made a Freedom of Information Act request pursuant to 5 U.S.C. sec. 552 (2012), in which he sought (among other things) the examination records of the revenue agent who examined his joint 2004 income-tax return. Goldberg received these records. Using these records, he developed a list of 22 periods for which he sought interest abatement and the reasons for which he sought interest abatement for each period. We refer to this list as the 2004 Abatement Schedule. Each period was delineated by Goldberg with a start date and an end date. The periods on the 2004 Abatement Schedule are as follows:

[*29]

| Period number | Date period begins | Date period ends | Number of days |
|---|---|---|---|
| Period 1 | 9/12/2007 | 9/20/2007[a] | 9 |
| Period 2 | 9/20/2007[a] | 9/27/2007 | 8 |
| Period 3 | 12/1/2007 | 1/31/2008[a] | 62 |
| Period 4 | 1/31/2008[a] | 3/11/2008[a] | 41[b] |
| Period 5 | 3/11/2008[a] | 4/28/2008 | 49[b] |
| Period 6 | 7/18/2008 | 7/30/2008 | 13 |
| Period 7 | 8/8/2008 | 8/16/2008 | 9 |
| Period 8 | 8/27/2008 | 9/4/2008[a] | 9 |
| Period 9 | 9/4/2008[a] | 9/22/2008 | 19 |
| Period 10 | 9/23/2008 | 9/25/2008 | 3 |
| Period 11 | 9/29/2008 | 11/13/2008 | 46 |
| Period 12 | 5/29/2009 | 6/8/2009 | 11 |
| Period 13 | 6/10/2009 | 6/15/2009 | 6[b] |
| Period 14 | 6/20/2009 | 7/27/2009[a] | 38 |
| Period 15 | 7/27/2009[a] | 8/9/2010 | 379[b] |
| Period 16 | 11/15/2010 | 12/8/2010[a] | 24 |
| Period 17 | 12/8/2010[a] | 1/3/2011 | 27 |
| Period 18 | 1/7/2011[c] | 1/10/2011 | 4 |
| Period 19 | 1/13/2011 | 2/15/2011 | 34[b] |
| Period 20 | 3/29/2011 | 4/15/2011 | 18 |
| Period 21 | 4/29/2011 | 8/23/2011 | 117[b] |
| Period 22 | 8/24/2011 | 6/26/2013 | 673[b] |

[a] These dates are listed twice in the 2004 Abatement Schedule. Though there is overlap between periods, when Goldberg listed a date as occurring within two different periods, he gave a different reason for interest abatement for the different periods. To consider his different arguments for abating interest for the same dates, we replicate his date ranges in our analysis.

[b] The actual 2004 Abatement Schedule miscalculated the number of days for each of these periods. We have noted these miscalculations, in certain footnotes in part III, infra. The number of days in the table are the actual number of days between the start and end dates even if the number of days in the table is different

**[\*30]** from than the number of days stated by Goldberg for the period in his 2004 Abatement Schedule.

ᶜIn this cell, Goldberg actually wrote "1/7/2010", but he requested four days of interest abatement. It seems that the entry of a 2010 date was a typographical error, and Goldberg appears to have intended to write "1/7/2011".

The period numbers are assigned by the Court for convenience. The number of days in each period includes the beginning and the ending dates.

Goldberg submitted the 2004 Abatement Schedule to Keen, who initially referred his request for interest abatement to an IRS interest-abatement coordinator named Lindsay O'Neil. O'Neil concluded that Goldberg was not entitled to interest abatement for any of the 22 periods. The parties have stipulated that O'Neil conveyed her conclusions to Keen and that Keen reviewed O'Neil's conclusions. However, the parties did not stipulate what method was used to communicate these conclusions. Nor does the record show what method of communication was used.

O'Neil documented her progress in evaluating Goldberg's claim for interest abatement in a document titled "Interest Abatement Activity Record". There, O'Neil wrote that she had been told to draw an "initial conclusion" about whether Goldberg was entitled to interest abatement and to convey this initial conclusion to the Office of Appeals "via memorandum".

**[*31]** According to the Interest Abatement Activity Record, after O'Neil had finished her review, she created a .zip file to convey her conclusions and the information she used in making those conclusions. She sent this .zip file to Keen, who followed up with O'Neil to ask questions.

According to O'Neil's Interest Abatement Activity Record, the .zip file included the following documents: "Form 886-A", "reviewer timeline", "inv control", three of RA Knighton's activity records,[9] the information document requests sent by RA Knighton, and "a couple of * * * [RA Knighton's] letters". Of the .zip file documents, one of RA Knighton's three activity records (for her examination of the Goldbergs' returns) is in the record. See supra note 9. The record does not contain the other two activity records that RA Knighton made. Some of RA Knighton's correspondence with Goldberg is in the record, but we do not know specifically to which "letters" O'Neil referred. None of the information document requests is in the record.[10] The "inv control" appears to mean an

---

[9]Specifically the activity records are described as "activity records for all 3 entities". We assume that "all 3 entities" refers to the Goldbergs, Wireless Distributors, Inc., and another S corporation that was also wholly owned by the Goldbergs. We discuss Wireless Distributors, Inc. and the other wholly owned S corporation infra part III.A, pp. 55-58.

[10]We discuss the contents of the information document requests and how we have determined their contents infra part III.A, p. 59.

[*32] inventory control document, which is not in the record. The "Form 886-A" is not in the record. We cannot determine whether the "reviewer timeline"[11] is in the record.

For CDP determinations that we review for abuse of discretion, we must determine whether the Appeals officer's determination lacked a sound basis in fact or law. Woodral v. Commissioner, 112 T.C. 19, 23 (1999). To do so, we scrutinize the Office of Appeals' reasoning underlying its determination and consequently the information it relied on in arriving at its determination. See Magana v. Commissioner, 118 T.C. 488, 493-494 (2002). At first blush, there are two types of gaps in the record that present the possibility that there is not enough information in the record to determine whether the Office of Appeals abused its discretion in denying Goldberg interest abatement. The first type of gap is that we do not know which fact-type documents Keen received from O'Neil. By fact-type documents, we mean the documents, used by Keen in making her determination, related to the events relevant to Goldberg's claims. For example, we do not know which of RA Knighton's letters O'Neil sent Keen. The second type of gap is that we do not know the contents of the analysis-type documents that O'Neil sent to

---

[11]It is possible that the spreadsheet at Exhibit 83-J is the "reviewer timeline" that O'Neil mentioned in the Interest Abatement Activity Record. However, as we explain infra, we need not determine whether it is.

[*33] Keen. By analysis-type documents we mean the documents possibly relied on by Keen showing O'Neil's analysis of the claims for interest abatement that Goldberg made in his supplemental CDP hearing. For example, we cannot determine the contents of the "Form 886-A" or the "reviewer's timeline" because the "Form 886-A" is not in the record, and it is not clear that the "reviewer's timeline" is in the record. And neither document's contents are described in the record. However, neither of these two types of gaps prevents us from determining whether the Office of Appeals abused its discretion.

We first address two concerns that arise because we do not know all of the fact-type documents upon which Keen relied. The first concern is that Keen may have relied on fact-type documents that are not in the record (i.e., Keen reviewed documents that the Court has not reviewed). Goldberg has not argued that the record is incomplete for this reason. We therefore treat the argument that the record is incomplete for this reason as having been waived. See Mendes v. Commissioner, 121 T.C. 308, 312-313 (2003).

The second concern regarding fact-type documents is that the record contains fact-type documents upon which Keen did not rely. Here, Goldberg has had a proper opportunity for a hearing at the Office of Appeals on the issue of interest abatement (i.e., the supplemental hearing), and the record before the Court

**[*34]** is sufficient to allow us to decide whether the Office of Appeals abused its discretion in denying Goldberg interest abatement. See Lunsford v. Commissioner, 117 T.C. 183, 189 (2001); see also Rivas v. Commissioner, T.C. Memo. 2017-56, at *9-*12. Neither party has argued that the record contains fact-type documents that Keen never received or considered. We treat as waived any argument that the record impermissibly includes fact-type documents upon which Keen never relied. See Mendes v. Commissioner, 121 T.C. at 312-313.

Nor are we prevented from reviewing the supplemental determination by any uncertainty as to the analysis-type documents upon which Keen relied. The supplemental notice of determination ultimately denied Goldberg interest abatement for each of the 22 periods for which he sought it. Keen authored an "Appeals Case Memo" that details her determinations in the supplemental notice of determination. The Appeals Case Memo is appended to the supplemental notice of determination. In the Appeals Case Memo, Keen adequately articulates her reasons for denying interest abatement for all 21 periods that the notice denied and that have not been conceded by the IRS.[12] Neither party urges the Court to

---

[12]For Period 21, which is conceded by the IRS, Keen wrote in the Appeals Case Memo that she believed Goldberg was entitled to interest abatement for that period. Period 21 is coterminous with the 117-day period between the Goldbergs' signing the May 2011 Form 4549 and their receiving a notice stating interest had

(continued...)

[*35] focus on O'Neil's decisions and analysis. Under section 6330(d)(1), we review the Office of Appeals' final determination as to issues raised in a CDP hearing. The final determination was not contained in anything that O'Neil provided Keen. The final determination regarding Goldberg's entitlement to interest abatement was the supplemental notice of determination. See Kelby v. Commissioner, 130 T.C. at 86-87. Therefore, there is no need to consider what analysis documents were relied on by Keen, and we review the supplemental determination.

The supplemental determination denied Goldberg interest abatement for each of the 22 periods for which he sought interest abatement. With the exception of Period 22 (August 24, 2011, through June 26, 2013) and Period 21 (which has been conceded), the Appeals Case Memo did not discuss each period specifically. Instead, the memorandum addressed the periods in the aggregate. The memorandum acknowledged that there was "evidence of delay on the part of both parties." However, the memorandum stated the delays did not entitle Goldberg to

---

[12](...continued)
been assessed. Keen wrote that before she finalized the supplemental notice of determination, she "offered" interest abatement for this period to Goldberg, but he "declined" it. It is not clear from Keen's notes or any other part of the record what she wanted from Goldberg in exchange for her "offer". However, because Period 21 has been conceded, we do not need to review Keen's reasons for denying interest abatement for that period.

**[*36]** interest abatement because (1) "there [we]re no unreasonable errors or delays by the * * * [IRS] in the performance of a ministerial or managerial act" and (2) certain delays were attributable to Goldberg.[13]  It also reiterated the conclusion in the original notice of determination that the May 2011 Form 4549 did not constitute a binding contract, meaning the "0.00" entered in line 19.c did not absolve Goldberg and his wife of liability for statutory interest.

The Appeals Case Memo did not take the position that Goldberg's claim for interest abatement should be considered only for interest accruing during the times specified in his November 14, 2012 request for a CDP hearing.  In that request Goldberg seemed to request interest abatement for the period starting with September 9, 2011 (the approximate date on which he submitted his Form 843 to the IRS).  The IRS on brief does not take the position that Goldberg's claims for interest abatement should be entertained by the Court only for interest accruing during the times specified in his November 14, 2012 request for a CDP hearing.  We conclude that it is proper for us to review claims for interest abatement for periods before September 9, 2011.  However, we review only the periods that

_____

[13]The Appeals Case Memo gives examples of delays by Goldberg.  The memorandum states that at various points Goldberg delayed in providing RA Knighton with information about the Niche sec. 419A plan, the Greater Metropolitan Benefits plan, and the Goldbergs' bases in their S corporations.

[*37] Goldberg raised at the Office of Appeals and for which the supplemental notice of determination disallowed interest abatement. See sec. 301.6330-1(f)(2), Q&A-F3, Proced. & Admin. Regs. Therefore, we limit our review to Periods 1-22.

On July 21, 2016, Goldberg moved for the Court to again remand the case to the Office of Appeals. Goldberg asked that the Court order the Office of Appeals on remand to consider his argument that the income adjustment in the May 2011 Form 4549 regarding the Niche section 419A plan was in error because it was contrary to the stipulation of settled issues in Captain Douglas J. Brown, Inc.

On September 21, 2016, the Court denied Goldberg's July 21, 2016 motion to remand. The order stated that Goldberg's Captain Douglas J. Brown, Inc. argument was a challenge to the "underlying tax liability", see sec. 6330(c)(2)(B), and that he was barred from pressing the argument in the CDP hearing because he had had a prior opportunity to do so. The order reasoned that had Goldberg not signed the May 2011 Form 4549, the IRS would have been required to issue him a notice of deficiency, and this notice of deficiency would have permitted him to petition the Tax Court to redetermine the deficiency. See Aguirre v. Commissioner, 117 T.C. at 327; Hall v. Commissioner, T.C. Memo. 2013-93,

**[*38]** at *10-*11.  In that deficiency litigation Goldberg could have asserted the Captain Douglas J. Brown, Inc. argument.

We held a trial in Chicago, Illinois, on October 26, 2016.  After trial, the parties submitted briefs on whether the Tax Court should sustain the notice of determination as supplemented.  Goldberg again presses his Captain Douglas J. Brown, Inc. argument.  As we explained in our prior order that is referred to in the paragraph above, Goldberg's Captain Douglas J. Brown, Inc. argument is a challenge to the underlying tax liability, he had a prior opportunity to make the challenge, he waived that opportunity, and he is barred from making this argument.  We have already addressed this argument by order.  We do not address it again.

On brief, Goldberg also contends that the May 2011 Form 4549 embodies a binding contract between the Goldbergs and the IRS and that the "0.00" in line 19.c is a term in the contract which prohibits the IRS from assessing interest liability for tax year 2004.  We term this argument the Form-4549-as-a-contract argument.  The IRS does not argue that Goldberg is precluded from making the Form-4549-as-a-contract argument by the prior opportunity provision of section 6330(c)(2)(B), which we discussed supra part I, p. 14.  Therefore we treat the prior-opportunity argument as waived.  See Mendes v. Commissioner, 121 T.C.

**[\*39]** at 312-313.  Nor does the IRS make any other contention as to why we cannot consider Goldberg's Form-4549-as-a-contract argument.  Under these circumstances, we will consider the argument.  We determine that Goldberg loses the argument on the merits.  See infra pt. II.

Goldberg also contends that he is entitled to interest abatement for the 22 periods for which it was denied in the supplemental notice of determination.  He argues that he is entitled to interest abatement because of alleged unreasonable errors and delays by the IRS.  Goldberg's interest-abatement claim was made to the Office of Appeals pursuant to a CDP hearing, and it was denied in a supplemental notice of determination.  His interest-abatement claim is a challenge to the liability that the IRS seeks to collect through the lien-notice filing.  This argument is properly before the Court.  See infra pt. III.

On brief, Goldberg for the first time makes the following arguments:  the IRS is "equitably estopped" from assessing interest on the deficiency because the IRS was bound to the "0.00" in line 19.c of the May 2011 Form 4549; Goldberg is entitled to relief under the doctrine of promissory estoppel because he and his wife detrimentally relied on the interest being fixed at "0.00"; and, in the alternative, the May 2011 Form 4549, as a "contract", should be set aside and declared void by the Tax Court because he and his wife were induced to enter into it due to RA

[*40] Knighton's alleged fraud or misrepresentation.  Because Goldberg did not raise these arguments at the CDP hearing, we do not address them.  See sec. 301.6330-1(f)(2), Q&A-F3, Proced. & Admin. Regs.

On brief, the IRS conceded that Goldberg was entitled to interest abatement for Period 21, which spanned April 29 through August 23, 2011.[14]  Because of this concession, the number of periods for which we must evaluate the Office of Appeals' determination not to abate interest is reduced from the 22 periods in the 2004 Abatement Schedule to 21 periods.

The notice of determination was issued on May 28, 2013.  Goldberg filed his petition on June 26, 2013, which is within 30 days of the initial notice of determination.  Therefore we have jurisdiction under section 6330(d)(1) to review the determination as supplemented.  See LG Kendrick, LLC v. Commissioner, 146 T.C. at 36; Kelby v. Commissioner, 130 T.C. at 87-88.

The petition is also within the 180-day period for filing suit to review an IRS denial of interest abatement.  See sec. 6404(h).  It is unnecessary, however, for us to determine whether we have jurisdiction under section 6404(h).  See Roudakov v. Commissioner, T.C. Memo. 2017-121, at *7-*12 (holding

_____

[14]This is the same period for which Keen "offered" Goldberg interest abatement before issuing the supplemental notice of determination.  See supra note 12.

**[\*41]** jurisdiction granted by sec. 6330(d)(1)); Norman v. Commissioner, T.C. Memo. 2016-98, at \*8-\*10 (same). Jurisdiction under section 6404(h) would not add to the issues we would resolve, nor would it affect the standard or scope of review for resolving these issues.

II. The Form-4549-as-a-contract argument

We turn to the merits of Goldberg's argument that the "0.00" entry on the May 2011 Form 4549 constituted a term in a binding contract relieving the Goldbergs of interest on their 2004 income-tax balance. Goldberg raised this argument at his CDP hearing, at his supplemental CDP hearing, and in his briefs. Goldberg's contract argument is an argument that he is not liable for interest on his 2004 underpayment of tax. Because this interest is the liability the IRS seeks to collect, Goldberg's contract argument is a "challenge to the underlying tax liability". Sec. 6330(c)(2)(B); Urbano v. Commissioner, 122 T.C. at 393. Furthermore, Goldberg's contract argument does not involve section 6404(e)(1). Therefore, we review de novo the determination of the Office of Appeals as to Goldberg's contract argument. Montgomery v. Commissioner, 122 T.C. at 8; Goza v. Commissioner, 114 T.C. at 181-182; cf. Krehnbrink v. Commissioner, at \*17 (applying abuse-of-discretion standard to sec. 6404(e) interest-abatement

[*42] claims made in a CDP hearing); Estate of La Sala v. Commissioner, at *16-*17 (same).

Below we excerpt relevant parts of the May 2011 Form 4549:

| 1. Adjustments to Income | Period End 12/31/2003 | Period End 12/31/2004 | Period End |
|---|---|---|---|
| a. NOL Carryback-Ronald Goldberg from 2005 | 415,334.00 | | |
| b. NOL Carryback- Gail Goldberg 2006 | | (1,271,781.00) | |
| c. Sch E-Inc/Loss-Wireless | | 645,162.00 | |
| d. NOL Carryback-Ronald 2006 | | (1,018,228.00) | |
| e. NOL Carryforward - 2003 Recapture | | 415,334.00 | |
| f. Other Income- NICHE | | 394,091.00 | |
| g. Other Income-Greater Metrpolitan Plan | | 601,328.00 | |
| h. Itemized Deductions | | (7,664.00) | |
| i. | | | |

* * *

| 19. Summary of Taxes, Penalties and Interest: | | | |
|---|---|---|---|
| a. Balance due or (Overpayment) Taxes - (Line 16, Page 1) | 10,577.00 | 46,865.00 | |
| b. Penalties (Line 18) - computed to 04/29/2011 | | | |
| c. Interest (IRC § 6601) - computed to 05/29/2011 | 0.00 | 0.00 | |
| d. TMT Interest - computed to 05/29/2011 (on TMT underpayment) | 0.00 | 0.00 | |
| e. Amount due or (refund) - (sum of Lines a, b, c and d) | 10,577.00 | 46,865.00 | |

* * *

| 2. Total Adjustments | 415,334.00 | (241,758.00) | |
|---|---|---|---|
| 3. Taxable Income Per Return or as Previously Adjusted | (1,030,488.00) | (476,268.00) | |
| 4. Corrected Taxable Income | (615,154.00) | (718,026.00) | |
| Tax Method | TAX TABLE | SCHEDULE D | |
| Filing Status | Joint | Joint | |
| 5. Tax | 0.00 | 0.00 | |
| 6. Additional Taxes / Alternative Minimum Tax | 10,577.00 | 46,865.00 | |
| 7. Corrected Tax Liability | 10,577.00 | 46,865.00 | |

We now discuss the excerpts from the May 2011 Form 4549. The form does not literally state that there is a deficiency. However, the "amounts due" match the definition of "deficiency", so essentially the Form 4549 shows deficiencies. See sec. 6211(a). The deficiencies were $10,557 for 2003 and $46,865 for 2004. The deficiencies came from various adjustments to income.

[*43] The May 2011 Form 4549 stated negative and positive adjustments to the Goldbergs' 2004 income-tax liabilities. The negative adjustments included (1) the Goldbergs' two net-operating-loss (NOL) carrybacks from 2006 to 2004 (one carryback from Goldberg's 2006 year, and one carryback from his wife's 2006 year) totaling $2,290,009 and (2) a $7,664 increase in the allowance of itemized deductions. The positive adjustments included (1) a disallowance of a loss in the amount of $645,162; (2) an NOL carryover recapture from 2003 in the amount of $415,334; (3) an adjustment of $394,091 related to the Goldbergs' S corporations' participation in a Niche section 419A plan;[15] and (4) an adjustment of $601,328 related to the Goldbergs' S corporations' participation in a Greater Metropolitan Benefits plan.

Line 19.c of the May 2011 Form 4549 stated that, for tax year 2004, "Interest (IRC § 6601)--computed to 05/29/2011" is equal to "0.00".

On April 29, 2011 RA Knighton signed the May 2011 Form 4549. On May 11, 2011, the Goldbergs signed the form. Directly above the Goldbergs' signatures on the form was the following statement:

---

[15]We noted supra part I, p. 37, that Goldberg argued that this case ought to be remanded to the Office of Appeals because, Goldberg alleged, the income adjustment was contrary to the stipulation of settled issues in Captain Douglas J. Brown, Inc. v. Commissioner, T.C. Dkt. No. 30453-08 (Apr. 29, 2011).

**[*44]** Consent to Assessment and Collection--I do not wish to exercise my appeal rights with the Internal Revenue Service or to contest in the United States Tax Court the findings in this report. Therefore, I give my consent to the immediate assessment and collection of any increase in tax and penalties, and accept any decrease in tax and penalties shown above, plus additional interest as provided by law. It is understood that this report is subject to acceptance by the Area Director, Area Manager, Specialty Tax Program Chief Counsel, or Director of Field Operations.

As explained below, the significance of this statement is that it is a waiver of the restrictions on assessment.

In general, the IRS may not collect a tax until the tax has been formally and timely assessed. See sec. 6502(a). To assess an unreported amount of tax (i.e., a deficiency) the IRS must mail the taxpayer a notice of deficiency, and it must ordinarily wait 90 days, or if the taxpayer files a petition with the Tax Court, it must wait until the decision of the Tax Court becomes final. Secs. 6212(a), 6213(a). Underpayment interest, provided for by section 6601, "shall be assessed, collected, and paid in the same manner as taxes." Sec. 6601(e)(1). Therefore, the collection of interest can only follow an assessment of interest. Secs. 6502(a), 6601(g). Under section 6502(a)(1), the period of limitations on the collection of tax begins on the date the IRS assesses the tax. Under section 6601(g), the IRS may assess interest "at any time during the period within which the tax to which such interest relates may be collected." Therefore the assessment of interest may

[*45] occur only after the assessment of "the tax to which such interest relates".

Secs. 6502(a)(1), 6601(g); see also Field, 381 F.3d at 113 ("Since the IRS's

assessment of interest against * * * [the taxpayer-plaintiff] coincided with the

commencement of the collection period, the assessment [of the interest] was no

doubt timely."); Priv. Ltr. Rul. 201319017 (May 10, 2013) ("[T]he Service cannot

assess additional interest on * * * [a] tax liability that was never actually

assessed.").

By executing a Form 4549, a taxpayer waives some of the restrictions on

assessment of the tax and the interest to which the tax relates. Aguirre v.

Commissioner, 117 T.C. at 327. Specifically, the taxpayer (1) waives pre-

assessment review by the Office of Appeals or the Tax Court, (2) waives the right

to receive a notice of deficiency, (3) consents to the immediate assessment and

collection of the tax shown on the form, and (4) consents to the immediate

assessment and collection of the "additional interest" imposed on the tax as

"provided by law". Section 6601 provides that taxpayers are liable for interest on

underpayments of tax that are not paid "on or before the last date prescribed for

payment". Sec. 6601(a). If a Form 4549 shows a positive adjustment to the

taxpayer's tax liability (i.e., a deficiency), by operation of section 6601 interest

will accrue on the deficiency from the date payment was due. Sec. 6601(a). A

[*46] taxpayer whose deficiency is subject to interest under section 6601 and who signs the Form 4549 thus consents to the immediate assessment and collection of the deficiency and the interest on that deficiency.

Goldberg seems to contend that the effect of his and his wife's execution of the May 2011 Form 4549 was to permanently fix their liability for interest at zero because line 19.c stated that, for the tax year 2004, "Interest (IRC § 6601)--computed to 5/29/2011" is equal to "0.00". This is not the effect of their signing the May 2011 Form 4549. Instead, by signing the May 2011 Form 4549, the Goldbergs consented to the immediate assessment and collection of two amounts related to their 2004 tax liability: (1) the 2004 deficiency of $46,865 shown on the May 2011 Form 4549 and (2) the "additional interest" on the deficiency "as provided by law".

The Goldbergs gave their consent "to the immediate assessment and collection of * * * additional interest as provided by law." (Emphasis added.) The word "additional" means "in addition to" something else. See Air Transp. Ass'n of Am. v. Lenkin, 899 F.2d 1265, 1266 (D.C. Cir. 1990). Applying this definition of "additional" to interpret the Form 4549, "additional interest" means interest "in addition to" the interest shown on the Form 4549. Combined with "as provided by law", the phrase "additional interest as provided by law" means

[*47] interest in addition to the interest shown on the Form 4549 if that interest applies by operation of law. The $46,865 deficiency was an underpayment of tax. By law, section 6601 imposes interest on underpayments of tax, and that interest begins to accrue on the "last date prescribed for payment". Sec. 6601(a). Thus, by executing the May 2011 Form 4549, the Goldbergs consented to the immediate assessment and collection of the interest that section 6601 imposed on the $46,865 deficiency.

Goldberg's argument that the interest was permanently fixed at zero fails because it is contrary to the terms of the waiver and consent in the May 2011 Form 4549 that he and his wife signed. If the Goldbergs had intended to permanently fix their interest liability at zero, they could have entered into a closing agreement, which is subject to the requirements of section 7121. See Urbano v. Commissioner, 122 T.C. at 393-394.

Section 7121 and the regulations thereunder set forth the exclusive means and procedures by which an agreement between the IRS and a taxpayer concerning the latter's tax liability may be accorded finality. See, e.g., Urbano v. Commissioner, 122 T.C. at 393-394; Hudock v. Commissioner, 65 T.C. 351, 362 (1975). An agreement made pursuant to section 7121 for any taxable period is final and binding on both the taxpayer and the IRS if the agreement complies with

**[\*48]** the procedures in section 7121 and the regulations thereunder.  Agreements

made pursuant to section 7121 are referred to as closing agreements.  See sec.

7121; sec. 601.202(b), Statement of Procedural Rules; sec. 301.7121-1(a), (d)(1),

Proced. & Admin. Regs.  Section 301.7121-1(d)(1), Proced. & Admin. Regs.,

provides that closing agreements must be in writing and executed on forms

prescribed by the IRS.

Section 601.202(b), Statement of Procedural Rules, provides that

"generally" the IRS will use one of two forms for closing agreements:  Form 866,

"Agreement as to Final Determination of Tax Liability", or Form 906, "Closing

Agreement on Final Determination Covering Specific Matters".  Form 866 is used

to determine conclusively a taxpayer's total tax liability for a taxable period.  Id.

Form 906 is used if an agreement relates to one or more separate items affecting

the tax liability of a taxpayer.  Id.

The content of the Forms 866 and 906 is different from the content of the

Form 4549.  There are four comparisons between Forms 866 and 906 versus Form

4549 that illustrate the wording characteristic of a closing agreement.  First, both

Form 866 and Form 906 contain language indicating the documents embody

agreements.  The titles of both Forms 866 and 906 contain the word "agreement",

each document refers to itself as an "agreement", and the parties' signatures certify

[*49] that both the IRS and the taxpayer "agree" to the documents' terms. By contrast, Form 4549 lacks the words "agree" or "agreement" altogether. Second, both Forms 866 and 906 state that the agreements are made pursuant to section 7121, the section that governs agreements accorded finality. Form 4549 does not contain any mention of section 7121. Third, Forms 866 and 906 both state that "[t]his agreement is final and conclusive". Form 4549 does not use the word "final" or "conclusive". In fact, it makes no claim to finality at all. Fourth, above the parties' signature lines on Forms 866 and 906, both forms provide that by signing them, the IRS and the taxpayer "have read and agreed to" the terms of the form. By contrast, nothing on the Form 4549 signed by the Goldbergs indicates the legal effect of RA Knighton's signature. And Form 4549 purports to affect only the taxpayers, not the IRS. As compared to Forms 866 and 906, the Form 4549 signed by the Goldbergs and RA Knighton bears none of the linguistic indicia that would purport to make it final or conclusive under section 7121.

In conclusion, the Goldbergs' execution of a Form 4549 did not permanently fix their interest liability at zero. Instead, by executing a Form 4549 the Goldbergs consented to the immediate assessment and collection of the $46,865 deficiency and the interest imposed by law on that deficiency. The type of finality that Goldberg seeks for the interest for his 2004 tax year can be

[*50] obtained only under a closing agreement made pursuant to section 7121. The terms of the Form 4549 bear no resemblance to the terms of the two types of forms the IRS uses for closing agreements--the Form 866 and the Form 906. Though there was a "0.00" entered in line 19.c of the Form 4549 signed by the Goldbergs, the 0.00 did not permanently fix their underpayment interest at zero because they consented to the immediate assessment and collection of "additional interest as provided by law".

III.    Interest abatement

Goldberg's remaining argument is that the Office of Appeals erred by concluding he was not entitled to interest abatement for 22 periods.

Section 6601(a) provides that interest accrues on any underpayment of tax. Section 6404(e)(1) provides that the IRS "may abate" an assessment of interest under certain conditions, which we discuss throughout this part, part III. For the 22 periods for which Goldberg seeks abatement of interest, the parties have limited their arguments to whether section 6404(e)(1) provides grounds for relief. We thus limit our analysis of Goldberg's remaining claims for interest abatement to section 6404(e)(1) and the regulations interpreting it. See Nicklaus v. Commissioner, 117 T.C. 117, 120 n.4 (2001).

[*51] We review Goldberg's interest-abatement claims for abuse of discretion for reasons explained in part I. Thus, Goldberg must prove that the IRS's denial of interest abatement was arbitrary, capricious, or lacked a "sound basis in fact or law." Woodral v. Commissioner, 112 T.C. at 23.

We turn to section 6404(e)(1), which sets forth the conditions under which the IRS may abate interest. Section 6404(e)(1) provides that the IRS may abate an assessment of interest that is attributable to any unreasonable error or delay by an IRS officer or employee in performing a managerial or ministerial act. The error or delay is taken into account for purposes of section 6404(e)(1) only if "no significant aspect of such error or delay can be attributed to the taxpayer involved."

The Internal Revenue Code does not define "managerial" or "ministerial" acts, but the regulations do. Sec. 301.6404-2(b), Proced. & Admin. Regs. A managerial act is "an administrative act that occurs during the processing of a taxpayer's case involving the temporary or permanent loss of records or the exercise of judgment or discretion relating to management of personnel." Id. subpara. (1). General administrative decisions, "such as the IRS's decision on how to organize" tax-return processing, are not managerial acts. Id. A ministerial act is "a procedural or mechanical act that does not involve the exercise of

**[*52]** judgment or discretion, and that occurs during the processing of a taxpayer's case after all prerequisites to the act, such as conferences and review by supervisors, have taken place." Id. subpara. (2). Decisions about the "proper application" of law are neither managerial nor ministerial acts. Id. para. (b). The regulations provide further guidance in examples, id. para. (c), which we discuss infra where relevant. Before turning to Goldberg's entitlement to interest abatement for the 21 periods, we briefly address our method for ascertaining Goldberg's arguments and positions.

Though we would generally refer to a party's briefs to determine its arguments, here we refer to the 2004 Abatement Schedule to determine Goldberg's arguments for his entitlement to interest abatement for each of the 21 periods. At trial, IRS counsel stated it would "accept that those [periods in the 2004 Abatement Schedule] are properly at issue in the case." The IRS also wrote its briefs and structured its witness examinations to respond to the arguments in the 2004 Abatement Schedule. Moreover, our review for abuse of discretion focuses on the reasoning and the conclusions drawn in the CDP hearing, which require an analysis of the arguments Goldberg made in the CDP hearing. See Magana v. Commissioner, 118 T.C. at 493. The 2004 Abatement Schedule contained those arguments, and it is those arguments that we address in this opinion. Goldberg's

**[*53]** briefs do not contain certain arguments found in the 2004 Abatement Schedule (although the briefs contain some ambiguous concessions that we discuss in the paragraph below). Therefore by focusing on Goldberg's 2004 Abatement Schedule, we are not ignoring arguments he raised in his briefs.

In his simultaneous answering brief, Goldberg makes ambiguous concessions of some days in 7 of the 22 periods for which he had sought and been denied interest abatement. He stated his concessions as numbers of days in a period (as opposed to specific dates in a period) for which he no longer seeks interest abatement. We discuss Period 1 as an example of how Goldberg stated his concessions on brief. For Period 1, see infra pt. III.B, Goldberg sought nine days of interest abatement in the supplemental hearing (as he stated on the 2004 Abatement Schedule). In its opening brief, the IRS requested the Court to find that it "did not commit any unreasonable error or delay in the performance of a ministerial or managerial act" during the nine days that make up Period 1. Goldberg answered that he "does not disagree for 8 days", without specifying the dates of the eight days he concedes and the date of the ninth day he does not concede. Those attempted concessions do not assist us in resolving the case because they do not specify which dates are conceded and which dates are still at issue.

**[\*54]** The specific dates matter because we look at each event occurring during each day for which Goldberg seeks interest abatement to determine whether there was an unreasonable error or delay in performing a managerial or ministerial act. See sec. 6404(e)(1). Goldberg's failure to provide specific dates in a period does not allow us to determine which event Goldberg no longer challenges as involving errors, delays, managerial acts, or ministerial acts.

We now discuss Goldberg's entitlement to interest abatement for the 21 periods specified by him in his 2004 Abatement Schedule. We also find it necessary to discuss events occurring in periods other than the 21 periods. Thus the remainder of this opinion contains two types of sections. The first type of section discusses events occurring during periods for which Goldberg has not sought and does not seek interest abatement, or for which the IRS has conceded he is entitled to interest abatement (Period 21). The second type of section discusses both events occurring within the periods and our conclusions as to whether Goldberg is entitled to interest abatement for each of those periods. The second type of section is subdivided into three parts: Introduction, Events, and Analysis and holding. There are 21 of the second type of section because we do not subdivide the conceded period (Period 21) into those three sub-sections. All sections are in chronological order.

**[\*55]** A.　The Goldbergs' 2004 income-tax return and the early stages of the examination of their 2004 income-tax return

Goldberg does not seek interest abatement for this period. We discuss the events of this period because they provide context to the events for which Goldberg seeks interest abatement.

The Goldbergs were the sole shareholders of five S corporations. The tax consequences of the Goldbergs' ownership in two of these S corporations undergirded each of the three major issues in the examination of their 2004 joint income-tax return: the carryback and carryover of NOLs, the deductibility of S corporation losses, and the recognition of income from terminations and conversions of benefit plans in which the S corporations participated.

On their 2004 joint income-tax return, the Goldbergs claimed a $985,367 NOL carryover deduction from an NOL that arose in 2003. The record does not show how the NOL arose, though it appears that it was attributable to losses from one or both of the S corporations they owned.

On their 2004 amended joint income-tax return, the Goldbergs claimed a carryback of NOLs arising in 2005, 2006, or both years. In the examination of their 2004 joint income-tax return, the IRS allowed the Goldbergs to carry back $2,290,009 of NOLs, and required them to recapture $415,334 of the 2003

[*56] carryover because of proposed adjustments to their 2005 tax liability. The losses giving rise to the NOLs appear to have passed through to the Goldbergs from one or more of their S corporations.

One of the Goldbergs' wholly owned S corporations was called Wireless Distributors, Inc. Wireless Distributors, Inc. had had losses every year since its inception. Every year, the Goldbergs deducted those losses in full on their personal income-tax returns, even though those losses exceeded the combined bases they held in the S corporation's stock and debt. On their 2004 return, the amount of the Wireless Distributors Inc. loss that the Goldbergs deducted was $645,617, without regard to basis. In their 2004 examination, the IRS disallowed the deductions claimed in excess of the Goldbergs' bases.

The Goldbergs' S corporations participated in two benefit plans that gave rise to income recognition events for the Goldbergs in 2004.[16] Both plans were structured such that the participating S corporations each contributed money to a different trust that had been established by the respective plan's administrator. These contributions were then used by each plan's trustee to buy life insurance

---

[16]Throughout the audit, the examining agent referred to the two plans as sec. 419 or sec. 419A plans.

[*57] policies on the lives of Goldberg and his wife. Pursuant to these two plans, the Goldbergs were each insured by two policies, for a total of four policies.

The first benefit plan was the Niche section 419A plan. One of the Goldbergs' wholly owned S corporations participated in the plan, but the record does not show which S corporation it was. Niche was the name of the entity that sponsored or marketed the first plan. At some point in 2004, the Niche section 419A plan in which the Goldbergs' S corporation participated converted from a "multiple employer" plan to a "single employer" plan.[17] In its examination of their 2004 return, the IRS determined this conversion constituted a recognition event that gave rise to $394,091 of income that the Goldbergs had never reported.

The second plan in which one of the Goldbergs' S corporations participated was the Greater Metropolitan Benefits plan. RMG Enterprises, Ltd., was an S corporation wholly owned by the Goldbergs. RMG Enterprises, Ltd., participated in the Greater Metropolitan Benefits plan. At some point, either the Goldbergs withdrew from the Greater Metropolitan Benefits plan or RMG Enterprises, Ltd., terminated its participation in the Greater Metropolitan Benefits plan. In its examination of their 2004 return, the IRS determined this withdrawal

---

[17]Multiple employer plans have been marketed as providing tax benefits to participating employers. Notice 95-34, 1995-1 C.B. 309, 309-310.

**[\*58]** or termination constituted a recognition event that gave rise to $601,328 of income that the Goldbergs had never reported.

The IRS's examination of the Goldbergs' 2004 joint income-tax return began in June 2007.[18] RA Knighton was assigned to the Goldbergs' examination. The IRS selected the couple's 2004 joint income-tax return for examination because the IRS had a national initiative to examine returns of taxpayers who, like the Goldbergs, had involvement with Niche section 419A plans. Though the Goldbergs' return was selected for examination because of their involvement in the Niche section 419A plan, the examination was not limited to the Niche issue for tax year 2004.

The examination focused on three areas: (1) the income arising from the Goldbergs' involvement in the two benefit plans; (2) the Goldbergs' carrybacks and carryovers of the NOL deductions; and (3) the deductibility to the Goldbergs of the losses of their wholly-owned S corporation, Wireless Distributors, Inc.

The first 20 of the 22 periods for which Goldberg requested interest abatement were during the examination. The examination ended with the signing of the May 2011 Form 4549. Most of our findings of fact related to these first 20

---

[18]The examinations of their 2003 and 2004 returns were performed simultaneously, but we focus on only the 2004 tax year.

[*59] periods are based on testimony given at trial and the activity log that RA

Knighton (the examiner) used to contemporaneously document her actions during

the examination of the Goldbergs' 2004 income-tax return. Unless otherwise

stated, we credit RA Knighton's activity log and her testimony.

On June 20, 2007, RA Knighton "opened [the] case file, prepared the

electronic folder", and mailed the first information document request (IDR) to the

Goldbergs.[19] We refer to this as the June 2007 IDR. Including that IDR, RA

Knighton issued a total of four IDRs throughout this examination. None is in the

record.[20] We understand their substance by looking at RA Knighton's activity log

and the correspondence surrounding the issuance of each IDR. This

correspondence includes the emails Goldberg and RA Knighton exchanged to

clarify requests and confirm receipt of information and paper documents.

Though not entirely clear, the record indicates that the June 2007 IDR asked

for information pertaining to contributions that the S corporation had made to the

Niche section 419A plan. Throughout June and early July 2007, Goldberg and RA

---

[19]Throughout all periods we discuss, Goldberg generally acted as the couple's liaison with RA Knighton; we have noted a few instances where the Goldbergs' representative acted on the couple's behalf.

[20]The record also lacks documents such as cover letters (if any existed) that accompanied the IDRs.

[*60] Knighton exchanged phone calls, emails, and letters.  In these June and July 2007 communications, it seems that RA Knighton sought information from Goldberg about the Niche section 419A plans, the Goldbergs' businesses, and their participation in other "retirement plans".[21]

On August 9, 2007, RA Knighton received some of the information she had requested from Goldberg in the June 2007 IDR.  It is not clear when Goldberg responded to each of the requests in the June 2007 IDR; his responses were piecemeal.

B.    Period 1:  September 12-20, 2007

1.    Introduction

The Office of Appeals denied interest abatement for the nine days from September 12-20, 2007.  On the 2004 Abatement Schedule, which was part of his submission to the Office of Appeals before the supplemental hearing, Goldberg argued that abatement should be granted because, he alleged, RA Knighton's activity log "[i]ndicates she was locked out of" the e-wrap system for nine days.[22]

_____

[21]It was not until April 29, 2008, that RA Knighton learned of the Goldbergs' involvement with the Greater Metropolitan Benefits plan.  See infra pt. III.H.

[22]In his simultaneous answering brief, Goldberg seemingly makes a concession, stating that "Petitioner does not disagree for 8 days" in response to the

(continued...)

[*61] The e-wrap system is the electronic system that IRS employees working off site use to connect to the IRS's computer system. The record does not show that RA Knighton was locked out for nine days, as explained below.

2.   Events

RA Knighton was locked out of the e-wrap system for one day, on September 17, 2007, not nine days as Goldberg alleges. Even though RA Knighton was locked out on September 17, 2007, her activity log--which Goldberg relied on to show his entitlement to interest abatement--shows that RA Knighton worked for four hours on the Goldbergs' examination that day. It also states that though Goldberg did deliver some of the necessary documents that she had requested in the June 2007 IDR, he did not deliver them all. During this period, Period 1, RA Knighton noted in her activity log that she had found additional issues in the Goldbergs' 2004 return and amended returns. These additional issues included the carryover and carryback of NOLs.

---

[22](...continued)
IRS's opening brief, which states that during the nine days of Period 1, the IRS "did not commit any unreasonable errors or delays in the performance of a managerial or ministerial act." For the reasons we explained supra part III, pp. 53-54, Goldberg's attempt to concede a number of days without providing the specific dates does not narrow the issues to be decided.

**[\*62]** For September 18 and 19, 2007, RA Knighton's activity log does not have any entries for work on the Goldbergs' 2004 examination. On September 20, 2007, RA Knighton worked on the Goldbergs' 2004 examination for three hours.

In conclusion, we do not credit either Goldberg's statement that RA Knighton was locked out of the e-wrap system for nine days or his implication that she did not perform any work on his case during Period 1. Instead, we find that RA Knighton was locked out of the e-wrap system for one day, on that day she performed four hours of work on the Goldbergs' examination, and she performed a total of seven hours of work on their examination during this nine-day period.

### 3. Analysis and holding

We uphold the Office of Appeals' denial of interest abatement for this period. Goldberg bears the burden of proving that RA Knighton made an unreasonable error or caused an unreasonable delay during this period. See Rule 142(a). Goldberg has not met his burden; he has not proven the facts underlying his allegation that RA Knighton was locked out of the e-wrap system for nine days and was thus unable to work for nine days. Instead, RA Knighton's activity log shows during this period she performed seven hours of work on the Goldbergs' examination. We do not see any error or delay, let alone an unreasonable error or delay. Consequently Goldberg has failed to show that the Office of Appeals

[*63] abused its discretion.  See Foote v. Commissioner, T.C. Memo. 2015-187, at *17, aff'd, 700 F. App'x 760 (9th Cir. 2017).

### C. Period 2:  September 20-27, 2007

#### 1. Introduction

The Office of Appeals denied interest abatement for the eight days from September 20-27, 2007.  Goldberg argued in the 2004 Abatement Schedule that interest abatement should be granted because allegedly RA Knighton "lacked knowledge of events or proceedures [sic]", thus delaying the conclusion of the Goldbergs' examination.[23]

#### 2. Events

As stated supra part III.B (Period 1), RA Knighton worked on the Goldbergs' 2004 examination for three hours on September 20, 2007.  On that day, she spoke to Goldberg "at length" about various issues, including a developing issue about the Goldbergs' claimed carryback NOL deductions.  It

---

[23]In his simultaneous answering brief, Goldberg seemingly makes a concession, stating that "Petitioner does not disagree for 7 days" in response to the IRS's opening brief, which states that during the eight days of Period 2, the IRS "did not commit any unreasonable errors or delays in the performance of a managerial or ministerial act."  For the reasons we explained supra part III, pp. 53-54, Goldberg's attempt to concede a number of days without providing the specific dates does not narrow the issues to be decided.

[*64] seems that for at least one year, 2006 or 2005, or both, the Goldbergs had filed their income-tax returns as married-filing-separately, whereas for 2004, they filed jointly. It was not clear to RA Knighton that the Goldbergs could carry back an NOL arising in a year for which the Goldbergs had filed separately to years for which the two had filed jointly. RA Knighton indicated in her activity log for September 20, 2007, that she "need[ed] to research to determine of [sic] this [carryback] is acceptable."

Also on September 20, 2007, RA Knighton prepared and sent an additional IDR to the Goldbergs, giving them a two-week due date "with understanding that additional time may be needed". We refer to this IDR as the September 2007 IDR.

Though it is not exactly clear, the September 2007 IDR seems to have requested information still outstanding from the June 2007 IDR, including information about the Niche section 419A plan contributions. The September 2007 IDR also sought information needed to determine the correctness of the Goldbergs' reported NOL carrybacks and information about the Goldbergs' bases in their stock and debt in their wholly-owned S corporations.[24]

---

[24]Though the record is not entirely clear on the issue, it seems that Goldberg did not satisfy the September 2007 IDR's requests for information about the Goldbergs' bases in their S corporation stock and debt until December 8, 2010--more than three years after RA Knighton had requested it.

**[*65]** There are no entries in RA Knighton's activity log for September 21-26, 2007. On September 27, 2007, RA Knighton received a fax from Goldberg with questions about the September 2007 IDR.

Though it is literally true that RA Knighton "lacked knowledge of events" relevant to the proper treatment of the Goldbergs' NOL carryback, she lacked this knowledge because it was a new development in the examination, and she had not yet received information about it from the Goldbergs. It is also literally true that RA Knighton "lacked knowledge of * * * [procedures]" for determining the proper treatment of the NOL carrybacks; however, RA Knighton lacked this knowledge in part because she did not yet have the underlying facts upon which to determine how to treat the NOLs. Because she did not yet have all the information and did not yet know the proper treatment of the NOLs, RA Knighton issued a second IDR (the September 2007 IDR), and she flagged for further research the issue (i.e., how an NOL can be carried back from separate returns filed for one year to a joint return filed for a different year). The September 2007 IDR sought information she had already requested in the June 2007 IDR and new information she needed to determine the proper carryback of an NOL. During this period, RA Knighton waited for Goldberg to provide information necessary for her to perform the examination.

**[\*66]**     3.     Analysis and holding

We uphold the Office of Appeals' denial of interest abatement for this period. Goldberg has failed to prove there was a managerial or ministerial act during this period. The record shows that RA Knighton decided she would need more information from the Goldbergs about their NOLs, and RA Knighton decided that she would need to research the proper method of carrying back the NOLs. Even if we assume these decisions unreasonably delayed the examination (which we do not), Goldberg's arguments must fail because RA Knighton's flagging an issue as needing additional information and research involved the exercise of discretion and regarded the proper application of Federal tax law. Thus, the hypothetical delay arising from her decisions did not occur in the performance of a managerial or ministerial act. See sec. 301.6404-2(b), Proced. & Admin. Regs.

"It is well settled that a decision concerning the proper application of Federal income tax law necessarily requires the exercise of judgment and discretion" and is not a managerial or ministerial act. Foote v. Commissioner, at *20; see also sec. 301.6404-2(b), Proced. & Admin. Regs. Section 172 of the Internal Revenue Code is federal tax law. It provides a deduction for NOLs. Sec. 172(a) and (b). RA Knighton made preliminary determinations about the types of

[*67] information she would need to determine the proper carryback of the Goldbergs' NOL deductions. These preliminary determinations necessarily required RA Knighton to exercise her judgment as to what information she would need and involved decisions concerning the proper application of federal tax law. These determinations are neither ministerial nor managerial acts under section 6404(e)(1). See sec. 301.6404-2(b), Proced. & Admin. Regs. Section 6404(e)(1) gives the IRS the discretion to abate interest only if there is a managerial or ministerial act. Here there was no managerial or ministerial act. It was not an abuse of discretion to deny Goldberg interest abatement for this period.

D.     Intermediary period: September 28 through November 30, 2007

Goldberg does not seek interest abatement for this period. We describe the events of this period to provide a complete background. RA Knighton spoke with Goldberg on October 10, 2007, about obtaining additional information relating to his 2004 joint income-tax return. It is not clear what they discussed, except that RA Knighton explained to Goldberg that she would prefer that he send her information in bulk as opposed to piecemeal.

**[*68]** E.    Period 3:  December 1, 2007, through January 31, 2008

     1.    Introduction

The Office of Appeals denied interest abatement for the 62 days from December 1, 2007, through January 31, 2008.  In the 2004 Abatement Schedule, Goldberg argued that interest abatement should be granted because allegedly the "RA's activity records show[] no activity" on his 2004 examination during this period.[25]

     2.    Events

In December 2007, RA Knighton made an entry in her activity log that she had received three separate packages from Goldberg with cover letters dated respectively November 30, December 11, and December 14, 2007.  Her activity log does not have any other entries for December 2007, nor does the record contain additional information about her activity for the month.  The packages from Goldberg contained some of the information RA Knighton had requested in

---

[25]In his simultaneous answering brief, Goldberg seemingly makes a concession, stating that "Petitioner does not disagree for 60 days" in response to the IRS's opening brief, which states that during the 62 days of Period 3 the IRS "did not commit any unreasonable errors or delays in the performance of a managerial or ministerial act."  For the reasons we explained supra part III, pp. 53-54, Goldberg's attempt to concede a number of days without providing the specific dates does not narrow the issues to be decided.

[*69] the September 2007 IDR. The response to the September 2007 IDR had been due in early October 2007.[26]

In the new year, 2008, there is no documented work on the Goldbergs' 2004 examination until January 31, 2008. On January 31, 2008, RA Knighton received a phone call from Offer-and-Compromise Appeals Officer Karin Banks. This phone call is discussed in more detail in Period 4, infra part III.F.

Though RA Knighton's activity log reflects little work on the Goldbergs' 2004 examination during December 2007, RA Knighton credibly testified that her activity log does not reflect her work on the examinations of other taxpayers for this period. RA Knighton was working on examinations other than the Goldbergs' 2004 and 2003 examinations. She maintained a separate activity log for each year for each taxpayer whose returns she examined, and she did not always note in her activity log for one examination that she was working on another examination. Even though her activity log for the Goldbergs' 2004 examination sometimes explicitly noted when she was not able to work on the Goldbergs' 2004 examination during other periods (writing, for example, "Delay in case due to RA

---

[26]It seems that RA Knighton subsequently determined that those three packages were insufficient to support the NOL carryback. It seems that RA Knighton determined that Goldberg did not provide sufficient information to support the NOL carryback until three years later on December 8, 2010.

[*70] working older priority cases"), she did not make such a notation for December 2007 or January 2008.

In conclusion, we find that during Period 3 RA Knighton documented receiving three packages from Goldberg and spending one hour on a phone call. Goldberg sent these three packages in response the September 2007 IDR, a response that was more than a month and a half overdue. RA Knighton also worked on other cases during this period, work which she did not document in her activity log for the Goldbergs' 2004 examination.

### 3. Analysis and holding

We sustain the Office of Appeals' denial of interest abatement for this period because Goldberg has failed to allege or prove that any delay during this period occurred in the performance of a managerial or ministerial act. During this period, RA Knighton had decided to work on examinations other than the Goldbergs' 2004 joint income-tax return examination. A revenue agent's "decision of how and when to work on a case, based on an evaluation of * * * [her] entire caseload and * * * [her] workload priorities, is not a ministerial act." Jean v. Commissioner, T.C. Memo. 2002-256, slip op. at 11; see also sec. 301.6404-2(b)(2), Proced. & Admin. Regs. (stating decisions involving "the exercise of judgment or discretion" are not ministerial acts). Nor is such a

**[*71]** decision a managerial act. It "is more akin to a general administrative decision", for which interest cannot be abated under section 6404(e)(1). Hornbacker v. Commissioner, T.C. Memo. 2016-65, at *19; see also sec. 301.6404-2(c), Examples (7) and (8), Proced. & Admin. Regs. Because RA Knighton's decisions about how and when to work on the Goldbergs' examination are neither managerial nor ministerial acts under section 6404(e)(1), abatement of interest was not allowable. The Office of Appeals' determination not to abate interest for this period, Period 3, was not an abuse of discretion.

F.      Period 4: January 31 through March 11, 2008

   1.      Introduction

The Office of Appeals denied interest abatement for the 41 days[27] from January 31 through March 11, 2008. In the 2004 Abatement Schedule, Goldberg argued that abatement should be granted because the "RA's activity record shows she was delayed" for the entire 41-day period "due to working on higher priority cases".

--------

[27]On the 2004 Abatement Schedule, Goldberg requested interest abatement for "39" days. The Office of Appeals correctly assumed Goldberg was requesting 41 days of interest abatement on the basis of the start and end dates he provided for Period 4.

**[*72]**     2.     Events

On January 31, 2008, the first day of this period, RA Knighton documented speaking with Banks. As we noted in Period 3, supra part III.E, p. 69, Banks had called RA Knighton. The two spoke about the Goldbergs' examination for one hour. Banks explained to RA Knighton that Goldberg had made an offer-in-compromise for multiple tax years, including 2004. This offer was pending at the time Banks spoke with RA Knighton. Banks said that once an offer is made for a specific tax year, the IRS is not "supposed to make any other assessments [of tax] for that year." The examination of the Goldbergs' 2004 tax year could yield deficiencies and additions to tax, which would in turn lead to assessments of tax. If the IRS accepted Goldberg's pending offer-in-compromise while the 2004 examination was still taking place, the IRS would be precluded from later assessing any deficiencies determined from the examination.[28] Banks thus concluded that Goldberg's offer for the 2004 tax year was premature because the Goldbergs' 2004 tax liability was still undetermined at the time Goldberg made the offer.

---

[28]According to Banks.

**[*73]** During February 2008, RA Knighton did not perform any work on the examination of the Goldbergs' 2004 return because she was busy "working [on] older priority cases" of other taxpayers or other tax years of the Goldbergs.

The record does not reflect any activity on the examination of any of the Goldbergs' returns on March 1-10, 2008. March 11, 2008, is discussed in the next period, Period 5, infra part III.G.

We find that for most of Period 4, RA Knighton was indeed delayed working on the Goldbergs' 2004 examination because she was working on other cases, though she did perform some work on the Goldbergs' 2004 examination on January 31, 2008.

### 3.    Analysis and holding

We sustain the Office of Appeals' denial of interest abatement for this period. Goldberg has neither identified nor proven that any delay during this period occurred in the performance of a managerial or ministerial act. "The prioritizing of work and caseloads is not a managerial or ministerial act." Hornbacker v. Commissioner, at *19; see also sec. 301.6404-2(c), Examples (7) and (8), Proced. & Admin. Regs. During this period, Period 4, RA Knighton prioritized working on "older priority cases" instead of working on the Goldbergs' 2004 joint income-tax return. Her decision to prioritize is not a ministerial or

[*74] managerial act. The Office of Appeals' denial of interest abatement for Period 4 was not an abuse of discretion.

### G. Period 5: March 11 through April 28, 2008

#### 1. Introduction

The Office of Appeals denied interest abatement for the 49 days[29] from March 11 through April 28, 2008. In the 2004 Abatement Schedule, Goldberg argued that abatement should be granted because RA Knighton's activity log shows that she performed no work during this period on the Goldbergs' 2004 examination or on the Goldbergs' returns for other years, or on any other taxpayers' returns. This argument reflects Goldberg's misunderstanding of how RA Knighton documented her activities.

#### 2. Events

On the first and second days of this period, March 11 and 12, 2008, Goldberg and RA Knighton exchanged voice mails and emails. It appears that Goldberg told RA Knighton that he needed her to speed up the examination because he believed the conclusion of his 2004 examination would result in a

---

[29]On the 2004 Abatement Schedule, Goldberg requested interest abatement for "39" days. The Office of Appeals correctly assumed Goldberg was requesting 49 days of interest abatement on the basis of the start and end dates he provided for Period 5.

[*75] refund that he believed he could use to reduce interest from accruing on his unpaid tax liabilities from 1994. This refund, it seems, was claimed on a Form 1040X, "Amended U.S. Individual Income Tax Return", that the Goldbergs had filed for their 2004 tax year. The record is unclear on the issue, but it appears that Goldberg believed that he was entitled to a 2004 refund because of the carryback of NOLs to 2004. RA Knighton told Goldberg that she was unable to "release" the money to Goldberg unless he planned to settle the entire examination of his 2004 joint income-tax return.

RA Knighton did not document any activity on Goldberg's 2004 joint income-tax return on March 13-24, 2008.

On March 25, 2008, Goldberg asked for an update on RA Knighton's progress on the examination. RA Knighton does not seem to have responded to Goldberg's request for an update, but she recorded in her activity log that she did not have control over his refund. Her notes do not explain why she lacked control over his refund, but we gather from other parts of the record that she thought she could not comply with Goldberg's request because the Form 1040X was for the year that she was examining, 2004, and she could not release any claimed refunds for that year until the entire examination was completed.

[*76] As the examination progressed, RA Knighton realized that the Goldbergs' involvement in the benefit plans was complex, and she sought assistance from the IRS's Issue Management Team ("IMT"). RA Knighton explained at trial that the IMT is a "group of people who are knowledgeable" about a specific issue. On the same day that Goldberg emailed her about his refund, March 25, 2008, RA Knighton contacted the IMT and scheduled a meeting with IMT member John Marien for the end of April 2008.

RA Knighton did not document any activity on the Goldbergs' 2004 joint income-tax return on March 26-31 or April 1-26, 2008.

On April 27, 2008, RA Knighton responded to another email from Goldberg about releasing the refund he had claimed on the Form 1040X. She told Goldberg that she had a three-day work session with an IMT member scheduled for April 29 through May 1, 2008.

On April 28, 2008, RA Knighton organized her case file in preparation for her three-day session with IMT member Marien.

During this entire period, as with prior periods, RA Knighton had been working on other cases for different taxpayers, different years of the Goldbergs, and even different years for the Goldbergs' S corporations. As with Period 3, she

[*77] did not document her activity for other taxpayers, years, or entities in her activity log that she kept for the Goldbergs' 2004 examination.

In conclusion, we find that RA Knighton was actively working on the Goldbergs' 2004 examination during this period, Period 5, and that she was working on examinations for other years, taxpayers, and entities.

### 3. Analysis and holding

We uphold the Office of Appeals' denial of interest abatement for this period because Goldberg has failed to prove an unreasonable error or delay in performing a managerial or ministerial act. Instead of an error or delay, the record shows that RA Knighton worked diligently on the Goldbergs' examination during this period. See Foote v. Commissioner, at *27. RA Knighton also chose to work on other examinations during this period. And even assuming this choice somehow delayed the Goldbergs' examination, RA Knighton's decision involved the exercise of discretion, which is not a ministerial act. See Jean v. Commissioner, slip op. at 11; see also sec. 301.6404-2(b)(2), Proced. & Admin. Regs. Goldberg has not put forth any evidence that this choice constituted a managerial act, either. Cf. sec. 301.6404-2(b)(1), Proced. & Admin. Regs. (defining "managerial act" as an administrative act "involving * * * the exercise of judgment or discretion relating to management of personnel"). Because there was

**[*78]** no unreasonable error or delay in performing a managerial or ministerial act, it was not an abuse of discretion for the Office of Appeals to deny interest abatement for Period 5.

H.     Intermediary period:  April 29 through July 17, 2008

Goldberg does not seek interest abatement for this period.  We describe the events of this period to provide a complete background.

From April 29 through May 1, 2008, RA Knighton and Marien worked a total of 12 hours on the Goldbergs' 2004 income-tax return, focusing on the Goldbergs' involvement in two benefit plans.  On April 29, 2008, RA Knighton documented that either she or Marien had determined that the Goldbergs (through one of their S corporations) were involved in the Greater Metropolitan Benefits plan.  It seems that before this April 29, 2008 notation RA Knighton had believed that the Goldbergs were involved in only the Niche section 419A plan.

On May 2, 2008, RA Knighton worked for two hours on the issue of if (and how) the NOLs that arose in a year when the Goldbergs filed separately could be carried back to 2004, a year for which the couple filed jointly.

From May 5-7, 2008, RA Knighton worked for seven hours on the Goldbergs' 2004 joint income-tax return.  On May 6, 2008, she made two requests for information from Goldberg.  The first request was in the form of a third IDR

**[*79]** (the May 2008 IDR), which appears to have sought information she had not yet asked for in any IDR. It seems (though is not clear) that this first May 6, 2008 request, the May 2008 IDR, sought information about the Goldbergs' involvement with the Greater Metropolitan Benefits plan. The second request was informally made via email and appears to have sought S corporation basis information that she had previously requested in the September 2007 IDR. In the email, RA Knighton requested that Goldberg provide her certain years' Forms 1120S, "U.S. Income Tax Return for an S Corporation", for two of the Goldbergs' wholly owned S corporations: RMG Enterprises, Ltd., and Wireless Distributors, Inc. RA Knighton explained that her requests were preliminary and that she would have "specific questions for * * * [Goldberg]" after she received this information.[30] She also let him know that he should expect to receive the May 2008 IDR in the mail.

Six days later on May 12, 2008, Goldberg emailed RA Knighton to confirm that he had received the May 2008 IDR, which sought information about the

---

[30]It is not clear when Goldberg fulfilled these requests for the Forms 1120S. They may have been fulfilled on May 30, 2008; August 16, 2008; or September 4, 2008. The requests for this preliminary information in the form of Forms 1120S seems to have been fulfilled by September 4, 2008, because on that day, RA Knighton determined that she needed to open examinations for the Goldbergs' subsequent tax years to determine the propriety of the NOL carrybacks.

[*80] Greater Metropolitan Benefits plan.  He said he would do his best to obtain the information, even though the "request is overwhelming".  Two days later, he emailed her again, echoing the May 12, 2008 email.

On May 19, 2008, RA Knighton received an email inquiry from Goldberg. His email seemed to ask questions about the IRS's objection to the Niche section 419A and Greater Metropolitan Benefits plans.  She sought Marien's assistance in responding to the email.  The two composed a response, and RA Knighton sent it to Goldberg.  She documented one hour of work on the email inquiry.  Goldberg responded the following day, May 20, 2008, confirming receipt of the email.

A few days later, on May 23, 2008, RA Knighton received an email from Goldberg listing the information he would send in response to the May 2008 IDR. In that email, he asked her a question about whether a particular precedent applied to his examination; RA Knighton forwarded the question to the IMT.

On May 27, 2008, RA Knighton received an email from Goldberg's Niche section 419A plan sponsor, Judi Carsrud.

On May 30, 2008, RA Knighton received documents from Goldberg that satisfied at least four of the requests in the May 2008 IDR.  These four requests

[*81] related to the contributions the S corporations had made to either of the two benefit plans.[31]

In June 2008, RA Knighton documented receiving two emails (on June 2 and 5) from Goldberg about satisfying IDRs. Aside from logging the receipt of the two emails, it does not appear that RA Knighton performed other work on Goldberg's 2004 return in June 2008.

During the period July 1-17, 2008, it does not appear that RA Knighton worked on Goldberg's 2004 joint income-tax return.

I.      Period 6:  July 18-30, 2008

        1.      Introduction

The Office of Appeals denied interest abatement for the 13 days from July 18-30, 2008. In the 2004 Abatement Schedule, Goldberg argued that interest should be abated because the "RA's activity records show[] that she had to work with IMT specialist as she was unable to understand" the components of the Goldbergs' examination, and thus "no work [was] done" on the 2004 examination, delaying its conclusion.

---

[31]The remaining requests in the May 2008 IDR were satisfied partially, if not fully, on August 16, 2008, over three months later.

[*82]      2.      Events

On July 18, 2008, RA Knighton reviewed the information Goldberg provided in partial satisfaction of the May 2008 IDR.  On that same day, RA Knighton asked Marien for help with the Niche section 419A plan issue, and they scheduled a meeting for July 30, 2008.  The two met on July 30, 2008, and worked for two hours on Goldberg's 2004 joint income-tax return.  They focused on how the various insurance policies funded the plans.

Also during this time RA Knighton was still waiting for Goldberg to fully respond to the May 2008 IDR, which sought information about the Greater Metropolitan Benefits plan.

We conclude that RA Knighton sought help from Marien, and RA Knighton did perform work during this period.

      3.      Analysis and holding

We sustain the Office of Appeals' denial of interest abatement for this period because Goldberg failed to identify any unreasonable delay that occurred during this period occurred in the performance of a managerial or ministerial act. Even assuming that RA Knighton's need to seek advice was unreasonably dilatory (an assumption that is not borne out by the record), the delay did not occur in the performance of a managerial or ministerial act because a decision to "request

[*83] advice is a decision concerning the proper application of federal tax law",
meaning it is "neither a ministerial nor managerial act."  Sec. 301.6404-2(c),
Example (9), Proced. & Admin. Regs.  RA Knighton's decision to seek assistance
from Marien about the proper treatment of the Niche section 419A plan was a
decision to request advice about federal tax law.  As such, it was neither a
managerial nor ministerial act.

Because Goldberg did not prove there was a managerial or ministerial act,
either of which is a predicate act for the IRS's abatement of interest, sec.
6404(e)(1), we find it was not an abuse of discretion for the Office of Appeals to
deny interest abatement for Period 6.

J.      Intermediary period:  July 31 through August 7, 2008

Goldberg does not seek interest abatement for this period.  We describe the
events of this period to provide a complete background.

On August 1, 2008, RA Knighton worked with Marien to prepare another
IDR (the August 2008 IDR), which RA Knighton sent to Goldberg.[32]  The August
2008 IDR seems to have pertained to the Niche section 419A plan and the Greater
Metropolitan Benefits plan.  RA Knighton wrote that Marien "may want to use

---

[32]It is not clear when (if ever) the August 2008 IDR was satisfied.

**[*84]** * * * [the Goldbergs'] case as a basis for his inquiries" into the examinations of other taxpayers who had been involved with Niche section 419A plans.

A few days later, on August 4, 2008, RA Knighton received an email from Goldberg that indicated he had received a refund on his 2004 return despite her examination of the return not yet having been completed. The email also indicated he would "give * * * [the August 2008 IDR his] prompt attention when it is received." The email suggests therefore that on August 4, 2008, Goldberg had not yet received the August 2008 IDR.

K.    Period 7:  August 8-16, 2008

1.    Introduction

The Office of Appeals denied interest abatement for the nine days from August 8-16, 2008. Goldberg argued that interest abatement should be granted for this period because RA Knighton's case activity record shows that another IRS employee "was too busy to work with" RA Knighton, allegedly delaying the

[*85] completion of the examination.[33]  Goldberg did not name this employee, but it is apparent that he was referring to Marien.

> 2.    Events

On August 8, 2008, RA Knighton received an email from Goldberg that confirmed he had received the August 2008 IDR.  On August 12, 2008, RA Knighton received an email from Goldberg informing her that he had sent her a certified letter.

On August 16, 2008--the last day in this period--RA Knighton received the certified letter referred to in the August 12, 2008 email.  The certified letter was accompanied by what appears to be the remaining information needed to complete Goldberg's response to the May 2008 IDR.  We note that this information was received more than three months after it was requested.  The information pertained to the Greater Metropolitan Benefits plan.  Upon receiving the certified letter, RA Knighton called Marien to "schedule a date for review."  Marien said he was unable to participate because he was leaving the IRS for private practice.

---

[33]In his simultaneous answering brief, Goldberg seemingly makes a concession, stating that "Petitioner does not disagree [sic] [for] 8 days" in response to the IRS's opening brief that during the nine days of Period 7, the IRS "did not commit any unreasonable errors or delays in the performance of a managerial or ministerial act."  For the reasons we explained supra part III, pp. 53-54, Goldberg's attempt to concede a number of days without providing the specific dates does not narrow the issues to be decided.

[*86] The record does not show that RA Knighton performed work on the Goldbergs' 2004 examination on August 9, 10, 11, 13, 14, or 15.

We find that during Period 7 (August 8-16, 2008), RA Knighton was waiting for Goldberg to deliver the information requested in the May 2008 IDR.[34] The documents requested in the May 2008 request had been provided on August 16, 2008, the last day of this period. It appears that these documents, as well as others that had been requested in the September 2007 IDR, were necessary for RA Knighton to proceed with the examination. The delay that Goldberg alleges occurred during this period was attributable to Goldberg's failure to provide these documents. The delay in completing the examination was not attributable to Marien's lack of time to meet with RA Knighton.

### 3. Analysis and holding

We uphold the IRS's denial of interest abatement for this period because Goldberg caused a significant aspect of the delay he alleged. Interest may not be abated if a "significant aspect of such error or delay can be attributed to the taxpayer involved". Sec. 6404(e)(1). In Foote v. Commissioner, at *25, we found the taxpayer responsible for significant aspects of the delay where he failed to

---

[34]RA Knighton may also have been waiting for information requested in the August 2008 IDR, but the record is not clear.

**[*87]** timely submit all requested documents that the examining agent needed to proceed with the examination.  See also Braun v. Commissioner, T.C. Memo. 2005-221, slip op. at 13-14 (finding various actions by taxpayer constituted significant aspect of error or delay, including failure to submit all requested information necessary to move forward with examination); Cosgriff v. Commissioner, T.C. Memo. 2000-241, slip op. at 8 (finding taxpayer's cancellation of "scheduled appointments" and "failure to timely produce requested information" that caused errors or delays were attributable to taxpayer).

Like the taxpayer in Foote, Goldberg has alleged that an IRS employee (RA Knighton) delayed his examination for a period in which he had not provided her with the information necessary for her to perform the examination.  She was waiting for information she had requested in the May 2008 IDR.[35]  He did not provide this information until the last day of this period.  We find Goldberg's failure to timely provide this information significantly (if not fully) caused any delay during this period.  See sec. 6404(e)(1).  We thus hold that the IRS did not abuse its discretion in denying interest abatement during this period.

---

[35]RA Knighton may have also been waiting for information she had requested in the September 2007 IDR.  Goldberg did not deliver all that information until December 2010.

**[*88]** L.    Intermediary period:  August 17-26, 2008

Goldberg does not seek interest abatement for this period.  We describe the events of this period to provide a complete background.

The record lacks any information about RA Knighton's work on Goldberg's 2004 joint income-tax return during this 10-day period.

M.    Period 8:  August 27 through September 4, 2008

1.    Introduction

The Office of Appeals denied interest abatement for the nine days from August 27 through September 4, 2008.  In the 2004 Abatement Schedule, Goldberg argued that interest abatement should be granted for this period because RA Knighton's "activity record shows that she only worked on this file for less than 1 hour".  This argument reflects Goldberg's misunderstanding of how RA Knighton documented her time.  RA Knighton testified that her activity log showed she in fact worked 14 hours on his examination during this period.

2.    Events

During the nine-day span of August 27 through September 4, 2008, RA Knighton documented working 14 hours on the Goldbergs' 2004 joint income-tax return and spending additional time examining their returns for other years.  In her

[*89] activity log, RA Knighton wrote that she documented the other examinations in separate activity records, which are not part of the record.

Goldberg's allegation that RA Knighton worked less than an hour during this period likely arises from his confusion about the way RA Knighton records her time. The following image is an excerpt from RA Knighton's activity log during this period, Period 8.

| Date | LOC | Time on 2003 | Time on 2004 | Remarks, Notes, Actions Taken |
|------|-----|--------------|--------------|-------------------------------|
| 8/27 | | | 2/38 | RA continued to work on the case organizing information. |
| 8/28 | | | 4/42 | RA continued to work on the case organizing information. |
| 8/29 | | | 4/46 | RA continued to work on the case organizing information. |
| 9/2 | | | 2/48 | RA continued to work on the case organizing information. |
| 9/3 | | | 2/50 | RA continued to work on the case organizing information. |
| 9/4 | | | 0/50 | It is determined that in order to properly cover all issues (including the NOL carry back) the subsequent years for the taxpayers need to be opened . The time keeping will be shown on the separate activity records since they no longer file a joint return. Case still being worked – time charged to those entities. Also waiting on determination of paying entity vs participating entity. Continue to question whether TP will be signing the 872's. |

At trial, RA Knighton explained that the numbers Goldberg assumed to be fractions of an hour in the column labeled "Time on 2004" show the number of hours she worked on the case for the day (the number to the left of the forward slash) and the cumulative hours that she had worked on the case to date (the number to the right of the forward slash). For example, on August 27, 2008, RA Knighton worked 2 hours; and including those 2 hours, her cumulative time on Goldberg's 2004 joint income-tax return was 38 hours. On August 28, 2008, she

[*90] worked 4 hours; and including those 4 hours, her cumulative time on the Goldbergs' 2004 joint income-tax return was 42 hours. The same pattern continues for the remaining days. RA Knighton documented her time in the same way for all periods that we discuss.

Goldberg's contention that RA Knighton worked less than one hour during the nine-day span seems to arise from the view that the use of slashes connotes fractions of an hour. If the entries for the nine-day span are interpreted as fractions in the "Time on 2004" column, with hours as their unit, then their sum is 0.32 hours, which is less than one hour. However, we find that Goldberg's interpretation was incorrect, and that RA Knighton worked a total of 14 hours during this nine-day period.

### 3. Analysis and holding

We uphold the Office of Appeals' denial of interest abatement for this period. Goldberg has failed to identify or prove an error or delay or a managerial or ministerial act. See sec. 6404(e)(1); see also Foote v. Commissioner, at *23 (denying interest abatement where taxpayers failed to identify predicate act). To the contrary, the record shows that RA Knighton worked steadily on Goldberg's 2004 examination during this period.

**[\*91]** Absent an error or delay and a managerial act or a ministerial act, no interest abatement is available under section 6404(e)(1). We hold that the IRS did not abuse its discretion in denying interest abatement because Goldberg failed to prove the predicate conditions under which it may be abated. See Banat v. Commissioner, T.C. Memo. 2000-141, slip op. at 6 ("[T]he Secretary has no authority to abate an assessment of interest on a deficiency unless that assessment is attributable in whole or in part to some error or delay by an officer or employee * * * of the Service in performing a ministerial act."), aff'd, 5 F. App'x 36 (2d Cir. 2001).

    N.    Period 9: September 4-22, 2008

        1.    Introduction

The Office of Appeals denied interest abatement for the 19 days from September 4-22, 2008. In the 2004 Abatement Schedule, Goldberg argued that abatement should be granted for this period because RA Knighton's activity record shows that at that point in his examination, she "was working on something other than the examination of" the Goldbergs' S corporation's section "419 plan". The section 419 plan could refer to either the Niche section 419A plan or the Greater Metropolitan Benefits plan because both were regulated by the provisions of section 419, and RA Knighton's activity log seems to have referred to them

[*92] both as section 419 plans.  We take Goldberg's argument to be that it was erroneous or dilatory for RA Knighton to work on anything other than the treatment of the Niche plan, the Greater Metropolitan Benefits plan, or both at this point in his examination.

    2.    <u>Events</u>

During Period 9, RA Knighton's activity log shows that she was working on various issues in the examination of the Goldbergs' 2004 joint income-tax return, including the appropriateness of the claimed carryback and carryover of NOLs. To correctly determine these carrybacks and carryovers, RA Knighton wrote in her activity log that she needed to open up examinations for years after tax year 2004. It also appears that she needed to examine the Form 1120S, "U.S. Income Tax Return for an S Corporation", that was filed by one of the S corporations of which the Goldbergs were 100% shareholders.  RA Knighton wrote in her activity log for the Goldbergs' 2004 examination that she documented her examination for the additional years and entity on separate activity records.  These records were not offered into evidence, though we have no reason to doubt that they existed and that RA Knighton documented her time in them.

On September 4, 2008, RA Knighton noted that the expiration of the period of limitations was quickly approaching and she had yet to complete her

**[\*93]** examination report or receive a Form 872-I, "Consent to Extend the Time to Assess Tax as Well as Tax Attributable to Items of a Partnership", from the Goldbergs.[36]  At some time before the period we are discussing, Period 9, RA Knighton had sent the Goldbergs a Form 872-I to extend the period of limitations for assessment to June 30, 2009.

RA Knighton also documented speaking on the phone with Goldberg and receiving emails from him during this period.  On September 19, 2009, RA Knighton called Goldberg and told him that because the period of limitations for assessment was imminently expiring and the Goldbergs had not yet signed Forms 872-I to consent to extend the period of limitations, she would be closing the case

---

[36]In general, the IRS may not assess tax more than three years from the date the return is due (if the return was filed on or before that date) or the date the return was filed (if the return was filed late).  Sec. 6501(a) and (b)(1).  The general three-year period can be extended when the IRS and the taxpayer consent in writing to extension.  Sec. 6501(c)(4).  This consent is often made in some version of the Form 872.  See sec. 601.105(f), Statement of Procedural Rules; see also Internal Revenue Manual ("IRM") pt. 8.21.3.1.3.5 (Aug. 14, 2007).

IRS Form 872-I, "Consent to Extend the Time to Assess Tax as Well as Tax Attributable to Items of a Partnership", allows for the extension of the period for assessment of tax with respect to both partnership items and nonpartnership items.  Form 872-I (February 2005); see also IRM pt. 4.31.2.6.3(3)(b.) (Mar. 4, 2008).  RA Knighton may have used a Form 872-I because the Goldbergs reported they owned partnership interests and reported related partnership items on their 2004 Schedule E, "Supplemental Income and Loss". The IRM directed agents to use a Form 872-I if "the examiner is uncertain as to the TEFRA status of any partnership in which the taxpayer has invested".  IRM pt. 25.6.22.4.3(1) (Mar. 1, 2008).

[*94] on the basis of the information she presently had in the case file.  She seems to have told him this would affect the amount or possibility of carrying the NOLs forward and backward.  Three days later, on September 22, 2008, Goldberg sent RA Knighton an email asking her to respond in writing to the various queries he had earlier put to her, some of which seemed to have been about the applicability of certain caselaw to his examination.[37]  RA Knighton did not immediately respond to the email.  She forwarded the email to her group manager and discussed the case with her group manager in the following period, Period 10, on September 23, 2009.

Goldberg's allegation that RA Knighton was working on something other than the examination of the section 419 plans is an accurate statement of RA Knighton's activities.  However, the inference he intends for us to draw from the statement--that this work created an error or delay--is unsupported.  To the contrary, RA Knighton appears to have spent considerable time on the Goldbergs' 2004 joint income-tax return, including determining the availability of "NOL carry back[s]".  It appears that RA Knighton chose to organize her work during this period to focus on issues other than section 419 plan issues.  It is not clear why she

---

[37]Goldberg sent one of these inquiries in a certified letter.  The letter is not in the record.  Goldberg sent this letter in response to the August 2008 IDR.

**[\*95]** made this choice.  The record reveals two likely reason:  one, Goldberg had not yet fulfilled the August 2008 IDR, which RA Knighton needed to make determinations on the Niche plan, or two, the section 419 issue may have (in the words of RA Knighton) "gone National", meaning RA Knighton lacked control over its resolution.  Regardless of her reasoning, RA Knighton made a choice to organize her workload to focus on issues other than the section 419 issue.

        3.      <u>Analysis and holding</u>

We uphold the Office of Appeals' denial of interest abatement for this period because Goldberg has not shown that it was an error for RA Knighton to work on issues other than the section 419 plan issue.  The record shows that RA Knighton worked diligently on other issues of the Goldbergs' 2004 examination.  Absent an unreasonable error or delay, the Office of Appeals lacks the discretion to abate interest under section 6404(e)(1).

Furthermore, Goldberg has failed to show that RA Knighton's decision to work on issues other than the section 419 issue is a managerial or ministerial act.  We have already explained, <u>supra</u> parts III.E and III.G (Periods 3 and 5, respectively), that such decisions about how and when to work on a case are neither managerial nor ministerial acts.  <u>See</u> <u>Jean v. Commissioner</u>, slip op. at 11; <u>Hornbacker v. Commissioner</u>, at \*19; <u>see also</u> sec. 301.6404-2(b)(2), (c),

**[*96]** <u>Examples</u> (<u>7</u>) and (<u>8</u>), Proced. & Admin. Regs.  The record does not show an error or delay or a managerial or ministerial act.  Thus it was not an abuse of discretion for the IRS to decline to abate interest under section 6404(e)(1).

O.    <u>Period 10:  September 23-25, 2008</u>

1.    <u>Introduction</u>

The IRS denied interest abatement for the three days from September 23-25, 2008.  In the 2004 Abatement Schedule, Goldberg argued that abatement should be granted for this period because allegedly RA Knighton's case activity log shows that she "worked 1/51 of an hour on the file" during this period.[38]  This argument reflects Goldberg's misunderstanding of how RA Knighton documented her time.  The same mistake permeated Goldberg's request for interest abatement for Period 8.  <u>See</u> <u>supra</u> pt. III.M.

---

[38]In his simultaneous answering brief, Goldberg seemingly makes a concession, stating that "Petitioner does not disagree for 2 days" in response to the IRS's opening brief that during the three days of Period 10, the IRS "did not commit any unreasonable errors or delays in the performance of a managerial or ministerial act."  For the reasons we explained <u>supra</u> part III, pp. 53-54, Goldberg's attempt to concede a number of days without providing the specific dates does not narrow the issues to be decided.

[*97]  2.  <u>Events</u>

Over the three-day period, RA Knighton documented her time in the same way as she had during Period 8.  The following image is excerpted from RA Knighton's activity log for Period 10.

| Date | LOC | Time on 2003 | Time on 2004 | Remarks, Notes, Actions Taken |
|---|---|---|---|---|
| 9/23 | | | | Discussed case with GM – meeting in Buffalo on Wednesday and will review and call TP then – RA bringing all case files to Buffalo. |
| 9/25 | | 1/1 | 1/51 | Continued to work on the case.  RA received an e-mail that his advisors have stated he should sign the 872 and he stated he would if I agreed to work with his professionals.  I replied that I would work with whomever he wanted me to as long as the appropriate 2848 was completed and filed allowing me to do so.  Requested controls of the 2003 return based on Carry back of NOL from 2005 returns and then the balance carried forward. |

As we explained for Period 8, <u>supra</u> part III.M, the notations of 1/1 and 1/51 do not indicate fractions of an hour.  Instead the number to the left of the forward slash indicates the number of hours RA Knighton worked on that day, and the number to the right of the forward slash indicates the cumulative number of hours RA Knighton had worked to date.  The above figure shows that RA Knighton worked for one hour on the Goldbergs' 2004 joint income-tax return and one hour on their 2003 joint return during this period, Period 10.  Cumulatively, she had worked 51 hours on the 2004 joint income-tax return and 1 hour on the 2003 joint income-tax return.  Goldberg's contention that RA Knighton worked less than one hour during the three-day span seems to arise from his misreading of her activity record.

[*98] We find, as we did for Period 8, <u>supra</u> part III.M, that Goldberg's interpretation of RA Knighton's entries in the case activity record was incorrect, and RA Knighton worked on the Goldbergs' returns for a total of two hours during this three-day period: one hour on their 2003 return and one hour on their 2004 return.

### 3. Analysis and holding

We uphold the Office of Appeals' denial of interest abatement for this period, Period 10, because Goldberg has failed to identify or prove an unreasonable error or delay. <u>See</u> sec. 6404(e)(1); <u>see also</u> <u>Foote v. Commissioner</u>, at *23 (denying abatement where taxpayers failed to identify predicate act, i.e., an error or delay). The record does not show that RA Knighton worked less than an hour during this period. Instead, the record shows that during Period 10, RA Knighton worked one hour on the 2003 return and one hour on the 2004 return. Goldberg has not shown that working for a total of two hours is an unreasonable error or delay.

Absent an error or delay (that is unreasonable) and a managerial act or ministerial act, interest abatement is not warranted. <u>See</u> sec. 6404(e)(1). Goldberg has failed to prove the existence of the predicate conditions for abatement of

[*99] interest. We hold the IRS did not abuse its discretion in denying interest abatement for this period, Period 10. See Banat v. Commissioner, slip op. at 6.

P.    Intermediary period: September 26-28, 2008

Goldberg does not seek interest abatement for this period. We describe the events of this period only to the extent that they bear on the periods at issue.

After Period 10, September 23-25, 2008, the focus of the examination shifted entirely away from the Goldbergs' involvement in the benefit plans (the section 419 issue). It seems that because the treatment of the plans had become a "national issue" RA Knighton had no control over the adjustment of the Goldbergs' income arising from their involvement with the plans. All periods after Period 10 that were coextensive with the examination, Periods 11-20, focused on the Goldbergs' carryover and carryback of NOLs and the substantiation of their bases in the stock and debt of their S corporations.

On September 26, 2008, RA Knighton recorded that she worked for one hour on the Goldbergs' 2003 joint income-tax return and one hour on their 2004 joint income-tax return. The following day, on September 27, 2008, she recorded that she received an email from Goldberg in which he stated: "[I]t will take me a few days to get the [Form] 2848 to you". Form 2848, "Power of Attorney and

**[\*100]** Declaration of Representative", is the form by which a taxpayer authorizes a representative to deal with the IRS.

Q. Period 11:  September 29 through November 13, 2008

1. Introduction

The Office of Appeals denied interest abatement for the 46 days from September 29 through November 13, 2008.  On the 2004 Abatement Schedule Goldberg argued that abatement should be granted for this period because allegedly RA Knighton's "activity record shows that she was working on other cases" and not the Goldbergs' case during this period.

2. Events

During this 46-day period, RA Knighton's activity log shows that she was working on the Goldbergs' examination.  Her activity log shows four entries, dated September 29, October 6 and 10, and November 13, 2008.

On September 29, 2008, RA Knighton received the Goldbergs' signed Form 872-I.  This Form 872-I extended the period of limitations for assessment for the Goldbergs' 2004 tax year to June 30, 2009.  That day, RA Knighton forwarded the signed Form 872-I to the IRS unit that processes such forms and sent the Goldbergs an approved copy.

[*101] She charged a total of three hours, on October 6 and 10, 2008, to completing and mailing a "report" to the Goldbergs. It seems that the report stated RA Knighton's findings from her examination for the Goldbergs' 2004 tax year. However, it was only a preliminary report that RA Knighton developed in anticipation of the expiration of the period of limitations on assessment for the Goldbergs' 2004 tax year. It was based on the limited information she had received from Goldberg. The final report was not developed until April 29, 2011. It seems likely that RA Knighton may not have been able to do much more with the Goldbergs' 2004 examination at this time because she was still waiting for them to submit outstanding information and the Forms 2848, "Power of Attorney and Declaration of Representative".

Before the start of this period, Period 11 (September 29 to November 13, 2008), Goldberg had asked RA Knighton to work with his representative. He made this request in an email dated September 25, 2008. See supra pt. III.O, p. 97 (Period 10). RA Knighton replied that she "would work with whomever he wanted * * * [her] to [work with] as long as the appropriate [Form] 2848 was completed and filed allowing * * * [her] to do so." In order for the IRS to work with a representative of the Goldbergs, both Goldberg and his wife would need to sign a Form 2848 and send it to the IRS. Shortly after Goldberg made his

**[*102]** September 25, 2008 request, RA Knighton sent Goldberg two Forms 2848. Apparently they were blank.

The person who had been the Goldbergs' tax-return preparer was Jeff Dubow. Jeff Dubow had a son of the same name who was also a tax professional. The record reveals that Dubow (the father) had passed away as of May 26, 2009, and he had been alive as of June 2007.

On November 13, 2008, RA Knighton received a completed Form 2848 from lawyers with the law firm of Ryan, Rapp & Underwood, P.L.C., that authorized those lawyers to represent Goldberg with the IRS regarding the specific issue of the Niche section 419A plan. This day was the final day of this period, Period 11. That November 13, 2008 communication was the last that RA Knighton heard from the Goldbergs or their representatives until six months later, in May 2009 (a date that is in Period 12).

On June 8, 2009, RA Knighton received from Dubow (the son) a Form 2848 that authorized him to represent the Goldbergs without any limitation to a particular issue.

In conclusion, we find that RA Knighton did perform work on the Goldbergs' 2004 examination during this period and that one of the Goldbergs' representatives provided a Form 2848 on the final day of Period 11, and the other

**[\*103]** did not provide a Form 2848 until June 2009. We also find that any delay that occurred during this period was attributable to Goldberg.

  3.  <u>Analysis and holding</u>

  We uphold the Office of Appeals' denial of interest abatement for this period, Period 11. Though a delay occurred, it was not caused by RA Knighton. Rather, a significant aspect of the delay is attributable to Goldberg.

  Under section 6404(e)(1), the IRS may not abate interest where a "significant aspect of \* \* \* [the] error or delay can be attributed to the taxpayer involved". <u>See also</u> <u>Braun v. Commissioner</u>, slip op. at 13-14 (noting actions of both the IRS and taxpayer caused delay, but denying interest abatement because taxpayer's "actions constituted a <u>significant</u> cause of the delay" (emphasis added)). The phrase "attributable to" means "due to, caused by, or generated by." <u>Lawinger v. Commissioner</u>, 103 T.C. 428, 435 (1994). If a significant aspect of an error or a delay is attributable to the taxpayer's representative, then it is attributed to the taxpayer. <u>See, e.g.</u>, <u>Foote v. Commissioner</u>, at \*24-\*25.

  Section 301.6404-2(c), <u>Example</u> (<u>13</u>), Proced. & Admin. Regs., describes a situation analogous to Goldberg's. In Example 13, the taxpayer moved from one state to another in the midst of the IRS's examination of his income-tax return. The taxpayer asked that the examination be transferred to the IRS office closer to

**[\*104]** his new address, and the IRS complied with this request. Id. The taxpayer moved again and again requested that the examination be transferred. Id. The IRS complied with the taxpayer's second request. Id. Example 13 states that the taxpayer's repeated moves caused "a delay in the completion of the examination." Id. Therefore, any interest that accrued because of this delay could not be abated under section 6404(e) "because a significant aspect of this delay is attributable to the taxpayer." Id.

Significant aspects of the delays during this period, Period 11, were caused by (1) Goldberg, (2) the Goldbergs' representatives, or (3) both. On September 25, 2008, a few days before the start of this period, Period 11, Goldberg had asked RA Knighton to work with his representatives to complete the examination. She agreed and waited to receive the Form 2848. She received Ryan, Rapp & Underwood's form on the final day of this period (November 13, 2008). She received Dubow's form more than six months later, on June 9, 2009. Like the taxpayer in Example 13, Goldberg had asked RA Knighton to perform the examination in a way that was most convenient for him, and RA Knighton complied with Goldberg's request. His representatives did not deliver the necessary consents to allow RA Knighton to move forward with Goldberg's request to work with his representatives, which in turn caused a delay. Because

**[\*105]** these delays are fully attributable to Goldberg, abatement of interest is not available for this period under section 6404(e)(1). See Foote v. Commissioner, at \*25. Thus, we hold it was not an abuse of discretion to deny interest abatement for this period.

R. Intermediary period: November 14, 2008, through May 28, 2009

Goldberg does not seek interest abatement for this six-month period. We describe the events of this period to provide a complete background.

During November 14, 2008, through May 26, 2009, RA Knighton documented that she had not received any information from Goldberg or the Form 2848 from Dubow (the son) that would authorize him to act on behalf of the Goldbergs. She experienced radio silence from Goldberg while she worked on other section 419 cases and on "priority work." During this six-month period, she worked a total of four hours on the Goldbergs' 2003 examination and three hours on their 2004 examination.

As of May 12, 2009, RA Knighton was waiting for information about the Goldbergs' bases in their S corporation shares and debt. This information had been requested in the September 2007 IDR and in other communications. RA Knighton was also waiting for the Goldbergs to execute the Form 2848 to grant powers of attorney to Dubow (the son). She did not receive Form 2848 from

[*106] Dubow (the son) until June 2009, and Goldberg did not provide all the S corporation basis information until December 8, 2010.

RA Knighton prepared to both finalize her report and prepare a second Form 872-I, "Consent to Extend the Time to Assess Tax as Well as Tax Attributable to Items of a Partnership".[39] This report, however, was a preliminary report seemingly made in anticipation of the expiration of the period of limitations on assessment for the Goldbergs' 2004 tax year. The final report was not completed until April 29, 2011.

On May 15, 2009, RA Knighton sent the preliminary report and a second Form 872-I to the Goldbergs and to Ryan, Rapp & Underwood. Eleven days later on May 26, 2009, Goldberg emailed RA Knighton to confirm he had received the preliminary report and the Form 872-I. Goldberg also told RA Knighton that he thought she was "working with his professionals regarding the resolution of these matters." Goldberg's "professionals" seem to refer to the people that Goldberg had intended to act as his and his wife's representatives before the IRS: Dubow (the son) and attorneys with the firm of Ryan, Rapp & Underwood. Goldberg seems to have believed that between September 27, 2008 (the last day RA

_____

[39]This second Form 872-I extended the period of limitations for assessment of the Goldbergs' 2004 income tax to December 31, 2010.

[*107] Knighton and Goldberg had communicated), and May 26, 2009, Dubow (the son) or attorneys with the firm of Ryan, Rapp & Underwood had been acting as Goldberg and his wife's representatives and had provided RA Knighton with the information she had previously requested. Goldberg did not know that Dubow (the son) had not yet returned a completed Form 2848 to RA Knighton; Goldberg also seems to not have known that RA Knighton had not yet received any of the information she had requested in the September 2007 IDR.

RA Knighton and Goldberg teleconferenced the following day, May 27, 2009.

### S.    Period 12:  May 29 through June 8, 2009

#### 1.    Introduction

The Office of Appeals denied interest abatement for the 11 days from May 29 through June 8, 2009. On the 2004 Abatement Schedule, Goldberg argued that abatement should be granted for this period. He alleged that RA Knighton's need "to correct her own error" on a Form 872-I had caused a delay in processing the Goldbergs' 2004 examination.

#### 2.    Events

Form 872-I is used to document a taxpayer's consent to extend the period of limitations on assessment of tax attributable to both partnership and

[*108] nonpartnership items. Some of the Goldbergs' income and losses may have come from partnerships in which they were partners. When RA Knighton received the second signed Form 872-I on May 29, 2009, she realized that she had prepared the Form 872-I using the wrong date to extend the period of limitations.[40] The following business day (Monday, June 1, 2009) she emailed Goldberg alerting him of her error, and she faxed him a corrected Form 872-I.[41] The Goldbergs returned the corrected Form 872-I by fax three days later on June 4, 2009. RA Knighton received the hard copies of the completed Form 872-I on June 8, 2009.

At trial, RA Knighton testified that the error in the Form 872-I did not impede her ability to proceed with the "substantive elements of the * * * [examination]" during this period. During this 11-day span, RA Knighton documented six entries, with a total of one hour of work on the Goldbergs' 2004 examination. This one hour was spent communicating with Goldberg to get the corrected Form 872-I returned. She was not working on the substantive issues,

_____

[40]On brief, counsel for the IRS calls RA Knighton's error a typographical error. We cannot determine the nature of the error because the erroneous Form 872-I is not in the record.

[41]At trial, RA Knighton testified that she sent them the corrected form on May 29, 2008, the same day she discovered the error. However, her activity log shows that she sent them the corrected form on June 1, 2008. We accord more weight to the activity log because it was made closer to the time of the activity, and more than eight years had elapsed between the event and the trial.

[*109] such as the claimed NOLs, in the Goldbergs' 2004 examination during this time. We reiterate that RA Knighton had still not received the necessary shareholder basis information that she requested in (1) the September 2007 IDR; (2) correspondence surrounding the September 2007 IDR; and (3) a May 6, 2008 email. Also, it was not until the final day of this period (June 8, 2009) that RA Knighton received the completed Form 2848 for Dubow (the son). Because RA Knighton had not yet received the shareholder basis information she needed to complete the examination, her date error could not have prolonged the examination or impeded her ability to work on the substantive issues of the examination. The examination was delayed because Goldberg or Dubow (the son) failed to deliver the needed documents.

### 3. Analysis and holding

We uphold the Office of Appeals' denial of interest abatement for this period, Period 12. The IRS may abate an assessment of interest that is "attributable to" an IRS employee's unreasonable error or delay. Sec. 6404(e)(1). We reiterate that "attributable to" means "due to, caused by, or generated by." Lawinger v. Commissioner, 103 T.C. at 435. If the accrual of interest is not caused by an IRS employee's unreasonable error or delay, then the IRS need not abate interest under section 6404(e)(1).

[*110] Goldberg argues RA Knighton's entry of an incorrect date on the Form 872-I delayed the examination by 11 days, which caused 11 days of interest to accrue during Period 12. The thrust of Goldberg's argument is that RA Knighton could have proceeded with the examination sooner if on May 29, 2009, she had received a signed and correct Form 872-I.

Goldberg's allegation that the assessment of 11 days of interest was attributable to RA Knighton's error is not supported by the record. Instead, the record shows that RA Knighton could not complete the examination for the Goldbergs' 2004 tax year without information about the Goldbergs' bases in their shares and debt of their S corporation. This is information that RA Knighton had already requested on three separate occasions. Neither Goldberg nor the Goldbergs' representatives had delivered this information before or during Period 12 (May 29 through June 8, 2009). In fact, RA Knighton did not receive all of this information until December 8, 2010.

Goldberg has not shown that the assessment of 11 days of interest was attributable to RA Knighton's error. Even if RA Knighton had received a correct, signed Form 872-I on May 29, 2008, she could not have proceeded with the examination because she lacked the necessary information, which she had already requested multiple times.

[*111] As the petitioner, Goldberg has the burden of proving his entitlement to interest abatement under section 6404(e)(1).  See Rule 142(a); Woodral v. Commissioner, 112 T.C. at 23.  He did not show that RA Knighton's error caused interest to accrue during the 11 days of Period 12, a showing required by section 6404(e)(1).  It was not an abuse of discretion for the IRS to deny interest abatement for this period, Period 12.

      T.     Intermediary day:  June 9, 2009

Goldberg does not request interest abatement for this day.  RA Knighton spent one hour working on the Goldbergs' 2004 joint income-tax return on June 9, 2009.

      U.     Period 13:  June 10-15, 2009

      1.     Introduction

The Office of Appeals denied interest abatement for the six days[42] from June 10-15, 2009.  In the 2004 Abatement Schedule, Goldberg argued that abatement should be granted for this period because allegedly "no work" on the Goldbergs'

---

[42]On the 2004 Abatement Schedule, Goldberg requested interest abatement for "5" days.  Appeals seems to have correctly assumed Goldberg was requesting six days of interest abatement on the basis of the start and end dates he provided for Period 13.

**[*112]** 2004 examination was indicated in RA Knighton's activity records. We find that work was indeed performed during this period.

Before detailing the events of this period, we first discuss the general context of RA Knighton's activities during this period. At some point before this period, RA Knighton communicated to Goldberg the need for him to provide her with additional information about the Goldbergs' bases in the stock and debt of their wholly owned S corporation Wireless Distributors, Inc. Three requests for additional information were made before this period: in the September 2007 IDR; in correspondence surrounding the issuance of the September 2007 IDR; and in the May 6, 2008 email. In May 2009, Goldberg asked RA Knighton to work with Dubow on this issue of basis substantiation. We now discuss the events of Period 13.

        2.     Events

During Period 13, RA Knighton made three entries for work performed on the Goldbergs' 2004 joint income-tax return. On June 10 and 13, 2009, RA Knighton and Goldberg exchanged emails about information to substantiate the Goldbergs' bases in their S corporation shares and debt. On June 15, 2009, the final day of this period, RA Knighton recorded working one hour on the 2004 examination. In this one hour, as she documented, she talked with the Goldbergs'

[*113] representative, Dubow (the son), to request--as she already had done in the September 2007 IDR and by phone and email to Goldberg--information about the Goldbergs' bases in their shares and debt of their wholly owned S corporations. In their conversation RA Knighton explained the basis issue to him and again requested the same information she had asked for a few times before. On June 15, 2009, RA Knighton seems to have emailed Goldberg, Dubow (the son), or both of them about the information she needed to address the basis issues.

Contrary to Goldberg's assertion, we conclude that RA Knighton did perform work during this period. We further find that she asked the Goldbergs' representative to provide information for which she had already repeatedly asked.

### 3. Analysis and holding

We uphold the Office of Appeals' denial of interest abatement for this period because Goldberg has failed to prove the existence of an unreasonable error or delay attributable to RA Knighton. Furthermore we find any error or delay that occurred during this period was attributable to Goldberg's failure to provide information necessary to show the Goldbergs' entitlement to a pass-through deduction for the losses of Wireless Distributors, Inc.

Wireless Distributors, Inc. was an S corporation. In general, S corporations are not subject to income tax. Sec. 1363(a). Income and losses of an S

[*114] corporation affect its shareholders' tax liabilities because an S corporation's shareholders generally calculate their tax liabilities by taking into account their pro-rata share of the corporation's "items of income * * *, loss, [or] deduction". Sec. 1366(a)(1). The "aggregate amount of [the S corporation's] losses and deductions taken into account by a shareholder" cannot exceed the sum of "the adjusted basis of the shareholder's stock in the S corporation" and "the shareholder's adjusted basis of any indebtedness of the S corporation to the shareholder", each determined tax year by tax year. Sec. 1366(d)(1). Thus whether a shareholder can claim a pass-through deduction depends on whether he or she has a sufficient basis in his or her S corporation shares and debt the S corporation owes him or her. Id.

A shareholder claiming a pass-through deduction, like the deduction claimed by the Goldbergs, is required to keep "such records" to substantiate that he or she has sufficient basis under section 1366(d)(1). Sec. 6001; see also sec. 1.6001-1(a), Income Tax Regs. (providing records must be "sufficient to establish the amount of gross income, deductions, credits, or other matters required to be shown by * * * [the taxpayer] in any return of such tax or information"); see also Gianulis v. Commissioner, T.C. Memo. 2018-187, at *9-*11. The Goldbergs were

[*115] the only two shareholders in the S corporation, and Goldberg seems to have been in charge of its operations.

The Goldbergs had claimed deductions for pass-through losses from Wireless Distributors, Inc., on their 2004 return, and RA Knighton had repeatedly asked before and during this period that the Goldbergs provide records to substantiate their bases in their stock in the S corporation and the debt the S corporation owed them. During this period, specifically on June 15, 2009, RA Knighton performed work. Contrary to Goldberg's assertion that she did nothing during this period, she attempted to obtain information to substantiate the Goldbergs' bases. Goldberg repeatedly failed to provide this information during this period, as well as in prior and subsequent periods. The record shows that any delay is fully attributable to Goldberg: he was to provide records to substantiate his and his wife's bases in the pass-through entities, and he failed to do so despite repeated requests. Because no interest is abated where a significant aspect of the error or delay was caused by the taxpayer, sec. 6404(e)(1), the IRS did not abuse its discretion in declining to abate interest for this period.

V.    Intermediary period: June 16-19, 2009

Goldberg did not request abatement for this period. We describe it only to lend context to the other periods for which Goldberg requested abatement. The

**[\*116]** only event documented for this period was RA Knighton's receipt of an email from Goldberg on June 16, 2009.

### W.    Period 14:  June 20 through July 27, 2009

#### 1.    Introduction

The Office of Appeals denied interest abatement for the 38 days from June 20 through July 27, 2009.  In the 2004 Abatement Schedule, Goldberg argued that abatement should be granted for this period, alleging RA Knighton's records reflect "no indication of any work done" on the Goldbergs' 2004 examination.

Before this 38-day period, Goldberg was made aware that RA Knighton was waiting for him or his and his wife's representative to provide her with the additional information regarding the Goldbergs' bases in their stock and debt of their wholly owned S corporations.  RA Knighton had informed the Goldbergs' representative, Dubow (the son), of the need; and RA Knighton had communicated with Goldberg directly about the need for the information.  Without this information, it appears that during this period, Period 14, RA Knighton could not work on the proper tax treatment of the items on the Goldbergs' 2004 return.

**[*117]**  2.  Events

During this 38-day period, RA Knighton communicated with Goldberg multiple times, sometimes by email and sometimes by telephone.[43]  She also documented one hour processing a Form 872-I that was returned to her by the group in the IRS that processes them.  RA Knighton clarified to Goldberg (after she had already done so with Dubow, the son) what information was needed and answered his corollary questions.  She needed information about the Goldbergs' bases in their S corporation shares and debt, which was information that she had requested in the September 2007 IDR; the correspondence surrounding the issuance of the September 2007 IDR; a May 6, 2008 email; and a June 15, 2009 email.  Despite RA Knighton's reiterations of her need for information, during these 38 days in 2009 neither Goldberg nor Dubow (the son) provided RA Knighton with any of the necessary information until over one year later, on

---

[43]RA Knighton documented receiving an email, dated July 23, 2009, in which Goldberg requested the contact information of a "Ms. Buffamonte * * * regarding a phone call * * * [he] got from her several weeks ago."  This may be the call that RA Knighton, her group manager, and Monika Buffamonte discussed during Period 17, infra part III.AA.  That call apparently pertained to Goldberg's examination for 1994.  There, Buffamonte called Goldberg to ask him to stop making calls to the home of the IRS employee who was examining his 1994 return.

[*118] October 20, 2010.  Even then, the submission was incomplete.  Goldberg did not supply all of the information until December 8, 2010.

We find that RA Knighton did indeed perform work on the Goldbergs' examination during this 38-day period.  However, because Goldberg or Dubow (the son) had failed to provide the information for which they had been repeatedly asked, during this period RA Knighton could not work on addressing the proper tax treatment of items on the Goldbergs' 2004 return.  Instead, her time was spent communicating with Goldberg or Dubow (the son).

### 3.    Analysis and holding

We uphold the Office of Appeals' denial of interest abatement for this period because Goldberg has failed to show an unreasonable error or delay attributable to RA Knighton.  Any delay that occurred during this period was attributable to Goldberg's failure to provide information necessary to show his and his wife's entitlement to a pass-through deduction for the losses of Wireless Distributors, Inc.  Specifically, Goldberg or Dubow (the son) failed to provide information about the Goldbergs' bases in their stock of the S corporation and the debt the S corporation owed them.  Our reasons for upholding the Office of Appeals' denial of interest abatement are identical to those we gave to deny interest abatement in Period 13, supra part III.U.  In short, Goldberg or the

**[*119]** Goldbergs' representative's failure to provide the necessary documentation was a significant cause of any delay that occurred during this period. Because the IRS may not abate interest where a significant aspect of the error or delay was caused by the taxpayer, sec. 6404(e)(1), we hold the IRS did not abuse its discretion in declining to abate interest for this period.

    X.    Period 15:  July 27, 2009, through August 9, 2010

        1.    Introduction

The Office of Appeals denied interest abatement for the 379 days[44] from July 27, 2009, through August 9, 2010.  In the 2004 Abatement Schedule, Goldberg argued that abatement should be granted for this period, alleging RA Knighton's activity log shows that RA Knighton "was working on other cases" and conducted "no activity on" the Goldbergs' 2004 examination.  We find that RA Knighton was indeed working on examinations other than the Goldbergs' 2003 or 2004 examination.  We also find that RA Knighton was unable to perform any work on the Goldbergs' examination because Goldberg, the Goldbergs' representative, or both Goldberg and the Goldbergs' representative failed to

---

    [44]On the 2004 Abatement Schedule, Goldberg requested interest abatement for "377" days.  The Office of Appeals seems to have correctly assumed Goldberg was requesting 379 days of interest abatement on the basis of the start and end dates he provided for Period 15.

**[*120]** provide RA Knighton with the necessary information, despite her multiple requests.

2.     Events

As explained supra, before this period, RA Knighton had repeatedly informed Goldberg and the Goldbergs' representative that she needed additional information.  They did not provide her with that information during this period.  They barely even communicated with RA Knighton.  This period began July 27, 2009.  Aside from a July 28, 2009 email addressing another issue, neither Goldberg nor the Goldbergs' representative communicated with RA Knighton until over a year later, on August 9, 2010.  Even then, Goldberg contacted RA Knighton only because she contacted him first.

Between July 28, 2009, and August 9, 2010, RA Knighton documented working on other section 419 cases and "priority work", which were apparently examinations that were not the Goldbergs' 2003 or 2004 examination.  Though Goldberg is correct that RA Knighton was working on other cases, his request for abatement ignores that she was unable to work on his case because he failed to provide her with the necessary information until October and December 2010, over a year after the first day of this period.

**[\*121]** On August 9, 2010, the last day during this period, RA Knighton spoke to Goldberg about the imminent expiration of the period of limitation for assessment, the need for basis documentation, and an apparent issue with the Form 2848 for Goldberg's wife. RA Knighton noted that her "time [was] charged to [o]ther years". These "[o]ther years" seem to have been the year in which the NOL arose, which appears to be 2005 or 2006. We find that the Goldbergs' examination was delayed, but the delay was caused by Goldberg or the Goldbergs' representative's failure to provide the necessary information to RA Knighton, despite her repeated requests.

### 3. Analysis and holding

We uphold the Office of Appeals' denial of interest abatement for this period because significant aspects of the delay that occurred during this period were caused by Goldberg or the Goldbergs' representative.

Under section 6404(e)(1) the IRS may not abate interest where a "significant aspect of such error or delay can be attributed to the taxpayer". In Foote v. Commissioner, at \*24-\*25, we held that delays caused by a taxpayer's representative's failure to deliver necessary documents were attributable to the taxpayer.

**[*122]** Like the delay in <u>Foote</u>, the 379-day delay coterminous with Period 15 was fully attributable to the petitioner, Goldberg, because, despite RA Knighton's repeated requests, Goldberg or the Goldbergs' representatives failed to provide the necessary documentation to substantiate the Goldbergs' pass-through deductions. Specifically, Goldberg or the Goldbergs' representatives failed to provide information about the Goldbergs' bases in their S corporation shares and the debt the S corporation owed them. This basis information was necessary to determine the availability of the deduction that the Goldbergs had claimed on their 2004 tax return. As discussed in Period 13, <u>supra</u> part III.U, taxpayers themselves are ordinarily the source of information regarding the deductions they have claimed. Absent this information, RA Knighton could not properly determine the Goldbergs' 2004 income. Because any delay during this period is fully attributable to Goldberg, we hold it was not an abuse of discretion for the IRS to decline to abate interest. <u>See</u> sec. 6404(e)(1).

 Y. <u>Intermediary period:  August 10 through November 14, 2010</u>

Goldberg does not request abatement for this period. The events in this period are significant for understanding the events in the periods for which Goldberg seeks interest abatement.

[*123] During this intermediary period, RA Knighton and Goldberg exchanged various communications. Significantly, Goldberg partially satisfied the September 2007 IDR on October 20, 2010, with a package of documents containing a note stating more would be sent under separate cover. On November 15, 2010, RA Knighton, Monika Buffamonte (RA Knighton's group manager at the time), and Goldberg spoke over the phone. RA Knighton and Buffamonte informed Goldberg that the section 419 issue had been turned over to the IRS's national office. As a result of this turnover, RA Knighton's regional office lacked control over the outcome of the section 419 issue. Buffamonte and RA Knighton recommended that Goldberg focus on documenting his and his wife's bases in their S corporation stock and debt.

Z.     Period 16:  November 15 through December 8, 2010

1.     Introduction

The Office of Appeals denied interest abatement for the 24 days from November 15 through December 8, 2010. In the 2004 Abatement Schedule, Goldberg argued that abatement should be granted for this period, stating the "RA's activity record shows [she was] busy with other cases" and therefore not working on his.

**[*124]**     2.     <u>Events</u>

The last day of this period, December 8, 2010, is when Goldberg finally provided the information RA Knighton needed to analyze the pass-through deductions.  This is information she had requested more than three years earlier in the September 2007 IDR.

RA Knighton's activity log states that on one day during this period-- December 8, 2010--she was working on "older priority case work" that seems to have been for taxpayers other than the Goldbergs.  We note she could not have worked on the Goldbergs' examination because Goldberg had failed to deliver the needed documentation to her until that day.  We find that RA Knighton did not work on the Goldbergs' 2004 joint income-tax return during this period because she was waiting for information from Goldberg.

          3.     <u>Analysis and holding</u>

We uphold the Office of Appeals' denial of interest abatement during this period, Period 16, because Goldberg's failure to provide the necessary documents until the final day of this period caused any delay of which he claims.  The IRS may not abate interest where a "significant aspect of such error or delay can be attributed to the taxpayer".  Sec. 6404(e)(1).  As we have explained <u>supra</u> parts III.K (Period 7), III.Q (Period 11), III.U (Period 13), III.W (Period 14), and III.X

**[\*125]** (Period 15), this means that the IRS may not abate interest where the delay was caused by a taxpayer's failure to provide necessary information that had been requested by the examining agent. <u>Foote v. Commissioner</u>, at \*24-\*25. Goldberg's failure to deliver necessary information caused the delay during this period. Interest abatement was not warranted under section 6404(e)(1). It was not an abuse of discretion for the IRS to so conclude for this period, Period 16.

    AA.   <u>Period 17:  December 8, 2010, through January 3, 2011</u>

        1.   <u>Introduction</u>

The Office of Appeals denied interest abatement for the 27 days from December 8, 2010, through January 3, 2011. On the 2004 Abatement Schedule, Goldberg argued that abatement should be granted for this period, characterizing RA Knighton's activity during this period thus:  "Discussion about UNAX with her supervisor. Not related to this case". UNAX is "[t]he willful unauthorized access or inspection of taxpayer records". Internal Revenue Manual pt. 10.8.1.4.1.3(1) (Dec. 16, 2006).[45] We find no evidence of unauthorized access, nor do we find any grounds for interest abatement.

---

    [45]This was the version of this part of the IRM in effect between December 16, 2006, and May 3, 2012.

[*126] As explained below, we believe that Goldberg's allegations focus on a January 3, 2011 conversation regarding the activities in his 1994 examination. Therefore we begin the Events section for this period by explaining Goldberg's 1994 examination.

2.     Events

Goldberg's 1994 return had been examined. We do not know if the 1994 examination occurred concurrently with the Goldbergs' 2003 and 2004 examinations, and we do not know if the 1994 examination occurred during Period 17. Buffamonte supervised the revenue agent who examined Goldberg's 1994 return. During the course of the 1994 examination, Goldberg had found the revenue agent's home telephone number and called him at home on a Sunday. At some point during the 1994 examination Buffamonte had called Goldberg to tell him he should not call the revenue agent at home.

On December 8, 2010, RA Knighton documented that she was working on cases that were neither the Goldbergs' 2003 nor their 2004 examination; they were "older priority case[s]". That day, she also documented having received all the information that she had first requested in the September 2007 IDR. See supra pt. III.Z, p. 124 (Period 16).

[*127] On December 23, 2010, Goldberg emailed RA Knighton, telling her that he intended to file a "1203"[46] complaint against Buffamonte, who had been RA Knighton's group manager but (as of December 23, 2010) no longer was RA Knighton's group manager. RA Knighton noted in her activity log that she did not respond to the December 23, 2010 email because she "want[ed] to verify that it is appropriate that * * * [she] give out this information at this time--* * * [Buffamonte was] no longer * * * [RA Knighton's] GM." RA Knighton noted in her activity log that she received this email, but she did not record the amount of time it took to read and consider it.

On December 29, 2010, RA Knighton documented working one hour on the Goldbergs' 2004 examination. She received an email that day from Goldberg in which he asked to revoke his and his wife's consent to the extension of the period of limitations on assessment for their 2004 tax year. RA Knighton responded to his email, telling him that because the Goldbergs signed a Form 872-I, their consent was not revocable. RA Knighton called her group manager (whose name is not in the record) to discuss Goldberg's request to revoke the consent and also

---

[46]Goldberg's reference to filing a "1203" appears to mean sec. 1203 of the Internal Revenue Service Restructuring and Reform Act of 1998, Pub. L. No. 105-206, 112 Stat. at 720. This section of the Act requires the Commissioner of Internal Revenue to terminate IRS employees for certain types of misconduct. Id.

[*128] to discuss Goldberg's December 23, 2010 request for Buffamonte's badge number. RA Knighton's group manager told RA Knighton that the Goldbergs could not revoke their consent and that RA Knighton should speak to Buffamonte about Goldberg's request. RA Knighton's notes say that she informed Goldberg that he and his wife could not revoke their consent.

A couple of weeks later, on January 3, 2011, RA Knighton recorded working a total of four hours on the Goldbergs' NOL carryback and dealing with an email request that Goldberg sent her that day. She did not document how much time she spent on each task.

On the same day, January 3, 2011, Goldberg emailed RA Knighton, telling her he intended to file a "1203" complaint against Buffamonte because he believed she "was investigating his 1994 audit". In that January 3, 2011 email to RA Knighton, Goldberg asked RA Knighton for (1) Buffamonte's badge number and (2) the date of the conversation in which Buffamonte urged him to focus on substantiating his basis in Wireless Distributors, Inc. (That conversation related to the 2003 and 2004 examinations, and it occurred on November 15, 2010.) Goldberg's belief that Buffamonte was investigating his 1994 examination seems to have somehow formed the basis for his allegation that RA Knighton spent her time discussing unauthorized access with her current group manager.

[*129] RA Knighton did not immediately respond to Goldberg's email. Instead, on that day (January 3, 2011), RA Knighton forwarded Goldberg's email to her group manager, and the two discussed how to proceed. RA Knighton's group manager suggested that RA Knighton forward Goldberg's email to Buffamonte and call her to discuss. RA Knighton sent Buffamonte Goldberg's email and called her. In their phone call Buffamonte told RA Knighton that she could give Buffamonte's badge number to Goldberg. Buffamonte also explained what she thought Goldberg meant when he said that she "was investigating his 1994 audit". She explained that during the course of an examination for Goldberg's 1994 tax year, Goldberg had looked up the revenue agent's home phone number and called him at home on a Sunday. Buffamonte told RA Knighton that she had supervised that revenue agent and that she had called Goldberg to tell him he should stop calling the revenue agent at home.

On January 3, 2011, after speaking to Buffamonte, RA Knighton called Goldberg to discuss her conversations with her group manager and Buffamonte. Her notes are cut off, but it appears that she provided him with Buffamonte's badge number and the date of the conversation (November 15, 2010) as Goldberg had requested in his email. The record does not show whether Goldberg filed a "1203" complaint against Buffamonte.

[*130] We summarize the salient events that seem to relate to Goldberg's argument that RA Knighton had a conversation about unauthorized access and that this conversation delayed his examination: On December 23, 2010, Goldberg asked RA Knighton for information related to Buffamonte, and RA Knighton seems to have not responded. On January 3, 2011, Goldberg asked for the same information a second time. In response, RA Knighton consulted with her supervisor about how to address Goldberg's request, RA Knighton obtained the information Goldberg requested, and then RA Knighton complied with Goldberg's request. Now, and before the Office of Appeals, Goldberg claims that he is entitled to interest abatement because RA Knighton spent time away from his 2004 examination in order to comply with his request for information relating to Buffamonte.

In conclusion, we find that during this period, RA Knighton worked on examinations other than the Goldbergs' 2003 and 2004 tax years, worked on the examinations for the Goldbergs' 2003 and 2004 tax years, and spent time responding to Goldberg's request for information about Buffamonte. We find that Goldberg's request for information about Buffamonte delayed the examination.

**[*131]**       3.       Analysis and holding

We uphold the Office of Appeals' denial of interest abatement for this period because a significant aspect of the January 3, 2011 delay is attributable to Goldberg, and he has not shown how a single day's delay would entitle him to the 27 days of interest abatement he seeks for Period 17.[47]  Interest may not be abated under section 6404(e)(1) if a "significant aspect of * * * [the] error or delay can be attributed to the taxpayer involved".  As in Period 11, Example 13 in section 301.6404-2(c), Proced. & Admin. Regs., describes a situation analogous to Goldberg's.  In Example 13, the taxpayer twice moves her residence and twice asks the IRS to transfer her examination to an office closer to her place of residence, and the IRS complies both times.  See supra pt. III.Q, pp. 103-104 (Period 11).  Example 13 states:  "The taxpayer's repeated moves result in a delay in the completion of the examination", and under section 6404(e)(1), "interest attributable to this delay cannot be abated because a significant aspect of this delay is attributable to the taxpayer."

Here, during Period 17, a significant aspect of the delay was caused by Goldberg.  On January 3, 2011, Goldberg asked RA Knighton to provide him with

_____

[47]We need not determine whether RA Knighton, her group manager, or Buffamonte's actions constituted managerial or ministerial acts.  Also, we need not determine if the delay was unreasonable.

[*132] information so that he could file a complaint against Buffamonte. RA Knighton complied and spent time fulfilling the request: She spoke to her supervisor, and then she spoke to Buffamonte. RA Knighton obtained the information Goldberg requested and then provided it to him. Fulfilling Goldberg's request took time away from RA Knighton's performing the substantive aspects of the Goldbergs' 2004 examination. Had Goldberg not asked her to provide him with information about Buffamonte, the record shows that RA Knighton would have worked on the proper treatment of the Goldbergs' NOLs for their 2003 and 2004 tax years. Like the taxpayer in Example 13, Goldberg introduced the cause of the delay. His request was the impetus for RA Knighton's stopping her examination for the Goldbergs' 2003 and 2004 tax years. Regardless of how long it took RA Knighton to get that information to Goldberg (and it could not have taken more than four hours), like the taxpayer in Example 13, Goldberg caused a significant aspect of the January 3, 2011 delay. Therefore he is not entitled to interest abatement for January 3, 2011.

Goldberg has failed to show that the delay that occurred on a single day during this period entitles him to interest abatement for the 27 days of Period 17. We cannot grant blanket requests for interest abatement. See Corson v. Commissioner, T.C. Memo. 2009-95, slip op. at 16. Petitioners must not only

[*133] prove the existence of an unreasonable error or delay in performing a managerial or ministerial act, see Rule 142(a); they must also connect the error or delay with the "specific period for which interest should be abated", Foote v. Commissioner, at *15. Here, Goldberg has failed to show that the January 3, 2011 delay entitles him to 27 days' interest abatement. Goldberg has also failed to show that any of the other events that occurred during Period 17 would entitle him to interest abatement under section 6404(e)(1). Instead, the record shows that RA Knighton spent Period 17 working steadily on the Goldbergs' 2003 and 2004 examinations.

Where a significant aspect of a delay is caused by the taxpayer, the IRS may not abate interest under section 6404(e)(1). The IRS may not abate interest under section 6404(e)(1) unless the conditions of the section have been met. Because Goldberg caused a significant aspect of the delay on January 3, 2011, and there are no other grounds for interest abatement for Period 17, it was not an abuse of discretion for the Office of Appeals to deny interest abatement for this period. See Woodral v. Commissioner, 112 T.C. at 23.

BB. Intermediary period: January 4-6, 2011

Goldberg does not request abatement during this period. We discuss the events of this period because they provide context for the events for which

[*134] Goldberg seeks interest abatement. During this period, RA Knighton worked for sixteen hours on the 2003 examination examining NOLs. She also performed research relating to the carryback of NOL deductions and Goldberg's wife's injured-spouse claim.

CC. Period 18: January 7-10, 2011[48]

1. Introduction

The Office of Appeals denied interest abatement for the four days from January 7-10, 2011. In the 2004 Abatement Schedule Goldberg argued that abatement should be granted for this period, stating there was "no indication of work" performed on his 2004 examination in RA Knighton's activity log.

2. Events

The trial record shows that RA Knighton performed work on the Goldbergs' 2004 joint income-tax return during this period, Period 18. During this period, RA Knighton documented a total of six hours of work on the Goldbergs' returns, with three hours on their 2003 joint income-tax return and three hours on their 2004 joint income-tax return. She worked all six hours on January 7, 2011.

---

[48]In the 2004 Abatement Schedule, Goldberg wrote the start date as "1/7/2010" and the end date as "1/10/2011", but he requested four days of interest abatement. The Office of Appeals seems to have determined that the entry of a 2010 start date was a typographical error and construed it as a 2011 date.

[*135] On that day, RA Knighton contacted the Goldbergs' representative, Dubow (the son), for injured-spouse information for 2003. Dubow (the son) faxed an undated copy of a Form 8379, "Injured Spouse Claim and Allocation", that he seems to have prepared. RA Knighton also documented that she needed to seek assistance on the proper carryback of NOLs when the filing status of the taxpayers for the year the NOLs arose was different from that for the years to which they sought to carry them back. She determined the proper carryback of the NOLs would also be affected by the Goldbergs' injured-spouse claim. On that day (January 7, 2011), RA Knighton contacted an IRS employee who had been an injured-spouse specialist.[49] The record does not reveal why RA Knighton reached out to someone who was not currently an injured-spouse specialist.

The record shows that RA Knighton did not work on the Goldbergs' 2004 joint income-tax return during the weekend of January 8 and 9, 2011.

The following business day, Monday, January 10, 2011, RA Knighton received a response to her injured-spouse inquiry and was provided with an IRS contact, Russell Freitag, to answer her question about the NOL carryback. She

---

[49]RA Knighton documented contacting an "innocent spouse" specialist on that day, but because of what she documented the previous day--referring to the issue as an "injured spouse" issue--we call it an injured-spouse issue.

**[*136]** contacted Freitag three days later on January 13, 2011. This is more fully detailed in the following period, Period 19, infra part III.EE.

We reject Goldberg's assertion that RA Knighton's activity records indicate no work was performed during this four-day period of January 7-10, 2011.

3.     Analysis and holding

We uphold the Office of Appeals' determination denying interest abatement for this period because Goldberg has failed to show the existence of any unreasonable error or delay in the performance of managerial or ministerial acts by RA Knighton, by the former injured-spouse specialist, or by Freitag. RA Knighton worked diligently on the case, stopping only to seek guidance on how to carry back the NOLs where there was an injured-spouse issue and to request additional information from the Goldbergs' representative. Seeking guidance on the application of federal tax law--such as the availability of NOL deductions--is neither a managerial nor a ministerial act. Sec. 301.6404-2(c), Example (9), Proced. & Admin. Regs.

The record shows that the former injured-spouse specialist returned RA Knighton's call the following business day and provided RA Knighton with Freitag's contact information. The IRS may abate interest only in the case of an "<u>unreasonable</u> error or delay", sec. 6404(e)(1) (emphasis added), and Goldberg has

[*137] failed to show that a two-day, weekend delay is unreasonable, cf. Hull v. Commissioner, T.C. Memo. 2014-36, at *19 (finding "slight delay" not unreasonable); see also Larkin v. Commissioner, T.C. Memo. 2010-73, slip op. at 11-12.

We hold that the IRS has not abused its discretion in denying interest abatement for this four-day period, Period 18, because the statutory prerequisites of section 6404(e)(1) have not been met.

DD.   Intermediary period:  January 11-12, 2011

Goldberg does not request abatement for this period.  The record does not show any activity during this period.

EE.   Period 19:  January 13 through February 15, 2011

1.   Introduction

The Office of Appeals denied interest abatement for the 34 days[50] from January 13 through February 15, 2011.  On the 2004 Abatement Schedule, Goldberg argued that abatement should be granted for this period, alleging RA Knighton's "[case] activity records show[] she was working on" other taxpayers'

_____

[50]On the 2004 Abatement Schedule, Goldberg requested interest abatement for "24" days.  The Office of Appeals seems to have correctly assumed Goldberg was requesting 34 days of interest abatement on the basis of the start and end dates he provided for Period 19.

[*138] cases and not his during this period. We find that RA Knighton was working on the Goldbergs' case as well as other cases during this period.

2.   Events

During this period, Period 19, it appears that RA Knighton performed work on the Goldbergs' 2003 and 2004 income-tax returns on the first and last days of the period, January 13 and February 15, 2011, respectively. In between those two dates, she noted a "[d]elay in [the] case" because she was "working [other] short statute cases." Such cases, RA Knighton explained at trial, are "always our highest priority." This prioritization policy, she believed, was an IRS policy.

On January 13, 2011, she called Freitag to figure out how to carry back NOLs to years when the taxpayers' filing status differed from that for the loss year and how the Goldbergs' injured-spouse claim affected the NOL carryback. On February 15, 2011, RA Knighton spent five hours preparing a "report", time that she charged to the Goldbergs' 2003 joint income-tax return. The record is not clear, but it appears that this report was the Revenue Agent Report, which includes a Form 4549, "Income Tax Examination Changes" (which we refer to as the February 2011 Form 4549[51]) and lead sheets. RA Knighton used the lead sheets to

---

[51]The record contains four iterations of the Form 4549, dated May 15, 2009; January 4, 2011; February 17, 2011; and May 11, 2011.

[*139] provide more detailed explanations of the proposed adjustments. This version of the report was not the final version; it was another preliminary version. The Goldbergs did not receive the final report until sometime between April 30 and May 11, 2011.

In conclusion, we find that RA Knighton was working on the Goldbergs' examination and other higher priority cases during this period.

3. Analysis and holding

We uphold the Office of Appeals' denial of interest abatement for this period because Goldberg has failed to show a managerial or ministerial act. RA Knighton worked on the Goldbergs' 2003 and 2004 joint income-tax returns but prioritized working on other taxpayers' cases during this period. When there were tasks to perform related to the Goldbergs' 2004 joint income-tax return and tasks to perform related to other taxpayers' returns, she performed tasks related to other taxpayers' returns before performing the task related to the Goldbergs' 2003 and 2004 joint income-tax returns. As we explained in Period 4, supra part III.F, p. 73, a revenue agent's "prioritiz[ation] of work and caseloads is not a managerial or ministerial act." See Hornbacker v. Commissioner, at *19; see also sec. 301.6404-2(c), Examples (7) and (8), Proced. & Admin. Regs.

**[\*140]** Because interest may not be abated absent a showing of a managerial or ministerial act, we hold that the IRS's decision not to abate interest for this period was not an abuse of discretion.

    FF.    <u>Intermediary period: February 16 through March 28, 2011</u>

Goldberg does not request interest abatement for this period. We explain it to provide useful background.

During this intermediary period, RA Knighton printed and mailed to the Goldbergs the February 2011 Form 4549, on which she had entered $22,056.71 of statutory interest due in line 19.c for the Goldbergs' 2004 tax year. Goldberg received the February 2011 Form 4549 either on or before February 24, 2011.

RA Knighton and Goldberg exchanged emails and phone calls during this period; after some back and forth, Goldberg requested a conference call, which occurred on March 3, 2011. The call included Goldberg, someone named Mike Smith,[52] RA Knighton, RA Knighton's group manager, and a section 419 coordinator from the IRS.

---

[52]Mike Smith appears to be an accountant, plan administrator, or other non-attorney advisor to the Goldbergs. The Goldbergs never gave Smith power of attorney.

**[*141]** At the time of the call, three issues were not fully resolved by or correctly treated in the February 2011 Form 4549. First, there was a redundant amount included in the adjustment to tax arising from the Niche section 419A plan. Second, the Goldbergs' alternative minimum tax had been either incorrectly computed or reported. And third, some of the basis substantiation issues from one of the S corporations, Wireless Distributors, Inc., were still outstanding.

After the March 3, 2011 conference call, Goldberg sent RA Knighton an electronic file of information intended to address those three issues. The February 2011 Form 4549 was subsequently revised on the basis of Goldberg's additional submissions.

GG.    Period 20:  March 29 through April 15, 2011

1.    Introduction

The Office of Appeals denied interest abatement for the 18 days from March 29 through April 15, 2011. In the 2004 Abatement Schedule, Goldberg argued that abatement should be granted for this period, alleging the "RA's activity record" shows that she performed "duplicative work" and that his examination was delayed because RA Knighton's "supervisor was not available". We reject both allegations:  that RA Knighton duplicated work and that RA Knighton's supervisor was not available.

[*142]        2.        Events

The record does not show that RA Knighton was doing duplicative work or that her supervisor was not available during this period.  Instead, it shows that during this period, Goldberg emailed RA Knighton once and that she reviewed the electronic package of information that Goldberg sent her after the March 3, 2011 conference call.  It further shows that RA Knighton communicated with other IRS employees to analyze whether the Goldbergs had sufficient bases in their S corporation shares and debt to claim deductions.

We assume that Goldberg's reference to RA Knighton's "duplicative work" has to do with the redundant amount included in the proposed adjustment to tax that was made in the February 2011 Form 4549 and discussed during the March 3, 2011 conference call.  Though the calculation contained a duplicative amount, there is no evidence in the record that RA Knighton was doing duplicative work during this period.

Nothing in the record even hints at the fact that RA Knighton's supervisor was not available during this period.  And Goldberg has failed to explain the relevance of this assertion.

We conclude that the record does not suggest either that RA Knighton performed duplicative work or that RA Knighton's supervisor was not available.

**[*143]** Further, Goldberg has not shown that even if RA Knighton's supervisor were unavailable, such unavailability would be relevant to his claim for interest abatement.

### 3. Analysis and holding

We uphold the IRS's denial of interest abatement for this period because Goldberg has failed to prove the occurrence of an unreasonable error or delay in performing a managerial or ministerial act. He has not proven that during this period RA Knighton performed duplicative work, RA Knighton's supervisor was unavailable, or any other facts that would constitute an unreasonable error or delay.

The taxpayer bears the burden of proving the IRS's denial of interest abatement constituted an abuse of discretion--that it was arbitrary, capricious, or lacked a "sound basis in fact or law." Woodral v. Commissioner, 112 T.C. at 23; see Rule 142(a). "The mere passage of time" does not establish an unreasonable error or delay. Lee v. Commissioner, 113 T.C. 145, 150 (1999). Instead, the taxpayer must specify and prove the grounds for interest abatement for each period. See Rule 281(b)(3); cf. Corson v. Commissioner, slip op. at 15 ("A request demanding abatement of all interest charged does not satisfy the required link; it merely represents a request for exemption from interest."). Where the

**[*144]** taxpayer has failed to prove that a managerial or ministerial error or delay occurred in the period for which interest abatement is requested, we have found no abuse of discretion in the IRS's denial. E.g., A-Valey Engineers, Inc. v. Commissioner, T.C. Memo. 2012-199, slip op. at 13-14.

Goldberg has failed to prove that an error or delay occurred during this period, Period 20. He alleged that during Period 20 RA Knighton performed duplicative work and that her supervisor was unavailable. The record does not support either of these allegations, nor does it show that unalleged events led to an error or delay. Though RA Knighton's activity log shows that a low amount of activity occurred during this period, this fact alone is insufficient to satisfy Goldberg's burden of proof because "[t]he mere passage of time" does not establish an unreasonable error or delay, Lee v. Commissioner, 113 T.C. at 150, let alone a managerial or ministerial act. Because Goldberg failed to prove the existence of an error or delay during the CDP hearing and at trial, we hold it was not an abuse of discretion for the IRS to deny interest abatement for this period.

HH.   Intermediary period:  April 16-28, 2011

Goldberg does not request abatement for this period. The record does not show any activity during this period.

**[\*145]** II.    Period 21:  April 29 through August 23, 2011

We do not analyze Goldberg's entitlement to interest abatement for this period because the IRS concedes that Goldberg is entitled to interest abatement for this period.  We describe the events of this period to provide a complete background.

The Goldbergs' 2003 and 2004 examinations concluded in April 2011.  On April 29, 2011, RA Knighton prepared the final Form 4549 relating to 2003 and 2004.  We referred to this version of the Form 4549 as the May 2011 Form 4549. We detailed the contents of the May 2011 Form 4549 supra part II, pp. 42-44.  RA Knighton also prepared various lead sheets that more fully explained these changes to the Goldbergs' tax liabilities.  The May 2011 Form 4549 showed that they owed $46,865 in additional tax for 2004.  In this final Form 4549, "0.00" was entered in the line providing for interest, line 19.c.  At trial RA Knighton explained that she did not compute the interest on the May 2011 Form 4549 because the interest on the Goldbergs' underpayment involved "restricted interest" which she was unable to calculate.[53]

---

[53]In general, the IRS must pay a taxpayer interest on an overpayment for the time it has the use of the taxpayer's money, sec. 6611(a), and a taxpayer must pay interest on an underpayment "for the time the taxpayer has the use of the government's money", Rev. Proc. 60-17, sec. 2.01(1), 1960-2 C.B. 942, 942

(continued...)

[*146] The Goldbergs received and signed the May 2011 Form 4549, which was dated May 11, 2011. Above their signatures, the May 2011 Form 4549 states:

> I give my consent to the immediate assessment and collection of any increase in tax and penalties, and accept any decrease in tax and penalties shown above, plus additional interest as provided by law.[54]

On August 1, 2011, the IRS assessed an underpayment amount of $46,865, and the assessed interest on that amount was $20,210.27. The underpayment amount had been shown on the May 2011 Form 4549. The interest had not. On the same date, August 1, 2011, the IRS mailed a CP 22 notice, to inform Goldberg of the amounts due.[55]

---

[53](...continued)
(referring to sec. 6601(a)). However, there are some provisions of the Internal Revenue Code that "limit or prohibit interest under certain conditions". Id. sec. 2.01(2), 1960-2 C.B. at 943. These provisions create a type of interest called "restricted interest". Id. Some of the Code provisions that can give rise to restricted interest include sec. 172(b) (2002) (NOL carrybacks), amended by Tax Cuts and Jobs Act of 2017, Pub. L. No. 115-97, sec. 13302(b)(1)(A), 131 Stat. at 2122, and sec. 6411(b) (tentative carryback allowance). See Rev. Proc. 60-17, sec. 2.02(1), 1960-2 C.B. at 943. RA Knighton's case activity log shows that the restricted interest came from the NOL carrybacks.

[54]Sec. 6601(a) of the Internal Revenue Code provides that the IRS will charge interest on underpayments and nonpayments of tax. Interest begins to accrue on the date that the payment was due. Id.

[55]The actual CP 22 notice is not in the record; the parties stipulated the August 1, 2011 assessment and mailing of the CP 22 notice.

[*147] Three weeks later, on August 23, 2011, the Goldbergs paid $50,000 toward their 2004 tax liability. This $50,000 was applied against their 2004 underpayment and part of the interest due on it. The $50,000 did not cover all the interest due on the 2004 underpayment. We mentioned this payment supra part I, p. 22.

JJ.    Period 22: August 24, 2011, through June 26, 2013

1.    Introduction

The Office of Appeals denied interest abatement for the 673 days[56] from August 24, 2011, through June 26, 2013. In the 2004 Abatement Schedule, Goldberg argued that abatement should be granted for this period, alleging there was a "delay in processing [his interest-abatement] claim" that was not resolved "until [his] court petition [was] filed".

2.    Events

This period is long and complex; we have separated our explanation of it into various stages.

---

[56]On the 2004 Abatement Schedule, Goldberg requested interest abatement for "671" days. The Office of Appeals seems to have correctly assumed Goldberg was requesting 673 days of interest abatement on the basis of the start and end dates he provided for Period 22.

**[\*148]**        a.        <u>Final notice of intent to levy and Goldberg's claim for interest abatement</u>

Less than a month after submitting the $50,000 payment on August 23, 2011, the Goldbergs received Letter 1058, "Final Notice of Intent to Levy and Notice of Your Right to a Hearing", on September 8, 2011.

The parties stipulated that "[o]n or around September 9, 2011, * * * [Goldberg] submitted Form 843, Claim for Refund and Request for Abatement for 2004." The Form 843 is in the record. Only Goldberg signed the Form 843; his wife did not. Form 843 provides various boxes for a taxpayer to indicate the reasons for requesting a refund or abatement. Goldberg checked two boxes: the box for income-tax abatement or refund and the box that said "[i]nterest was assessed as a result of IRS errors or delays", the interest-abatement box. On the Form 843, he sought a refund of $67,075.22, which is approximately equal to the 2004 deficiency and interest assessed on it. On the Form 843, Goldberg attempted to challenge the assessment of a $46,865 deficiency and the interest on it. On that form, Goldberg made the <u>Captain Douglas J. Brown, Inc.</u> argument. On that form he also alleged that there were "Mangerial [sic] delays of the time taken to perform the audit due to examiners [sic] case load being reassigned to other cases".

**[\*149]** Goldberg's Form 843 did not explain the allegation about "[m]angerial [sic] delays" or specify any particular action that was delayed.

Between September 2011 and September 2012, Goldberg received multiple letters from the IRS requesting an additional 45 days to process the Form 843. The record does not contain any of these letters, but Goldberg credibly testified to his having received them. In this year-long period, Goldberg also received calls from the IRS's Collection Department. It is not entirely clear when Goldberg was informed that his claim for interest abatement was denied, though he eventually was told it was denied.[57]

### b. Contact with Taxpayer Advocate Service

On September 10, 2012, about a year after Goldberg had filed the Form 843, he contacted the Taxpayer Advocate Service to get assistance with the claims he made on the Form 843. The Taxpayer Advocate Service became involved in Goldberg's efforts to get his Form 843 claims resolved. The record suggests that thereafter, he was contacted by Lindsay O'Neil from the IRS's Interest Abatement Group sometime between October 1 and 26, 2012.

---

[57]The record shows that the May 28, 2013 notice of determination was the first time that Goldberg had been notified in writing of the denial of the claims made on the Form 843. The notice of determination is discussed in Period 22, infra part III.JJ.2.e.

[*150] O'Neil did not explain to Goldberg why for the prior 13 months (i.e., September 2011 to September 2013) the IRS had sent him letters stating it needed 45 additional days to process his Form 843 claim. Instead, O'Neil told Goldberg that she would refer his claim for audit reconsideration, presumably because most of his claim on the Form 843 focused on the Captain Douglas J. Brown, Inc. argument, which effectively asserted that RA Knighton had failed to apply the Captain Douglas J. Brown, Inc. stipulation of settled issues to his examination findings.[58] This failure, reasoned Goldberg, resulted in RA Knighton's allegedly erroneous finding that the Goldbergs had underpaid their 2004 tax liability by $46,865. We previously discussed the arguments made on the Form 843 supra part I, pp. 23-24.

### c. IRS files notice of lien

On October 30, 2012, the IRS filed a notice of lien with Lake County, Illinois, for $17,071.22, and it sent the Goldbergs the notice of the lien filing (Letter 3172 (DO)) on November 1, 2012. The lien-filing notice stated that the Goldbergs had a right "to a hearing with * * * [the IRS] to appeal this collection

---

[58]It is not clear that the audit reconsideration ever occurred. The Taxpayer Advocate Service documented that audit reconsideration had occurred and that Goldberg appealed the audit reconsideration group's determination to the Office of Appeals. However, the Office of Appeals did not document the findings or determination of the audit reconsideration group.

[*151] action".  The lien-filing notice stated the "Amount on Lien" for the 2004

tax year was $17,071.22.  It also stated that the date of assessment was August 1,

2011, in the amount due for the 2004 tax year.  The lien amount ($17,071.22) is

the approximate difference between the 2004 tax liability assessed on August 1,

2011 ($67,075.27), and the Goldbergs' August 23, 2011 $50,000 payment.  The

2004 tax liability comprised $46,865 in underpayment and $20,210.27 in interest

on that underpayment.  The lien amount, $17,071.22, seems to represent the

amount of unpaid interest on the Goldbergs' 2004 liability.[59]

### d.      Collection-due-process proceedings

Goldberg timely filed a Form 12153, "Request for a Collection Due Process

or Equivalent Hearing", on November 14, 2012.  See sec. 301.6320-1(b), Proced.

& Admin. Regs.  Goldberg's wife did not sign the Form 12153.  On the Form

12153, Goldberg made three arguments:  the Captain Douglas J. Brown, Inc.

argument, the Form-4549-as-a-contract argument, and his entitlement to interest

---

[59]Because the $50,000 payment did not cover the entire $67,075.27 in 2004 tax liabilities, we assume that the IRS followed its ordinary procedure and applied the $50,000 payment first against the $46,865 underpayment and then against the interest due.  See Rev. Proc. 2002-26, sec. 3.02, 2002-1 C.B. 746, 746.  Though the IRS will honor taxpayers' written directions "as to the application of the payment" of tax, id. sec. 3.01, the record does not show that the Goldbergs had provided specific directions as to the application of the August 23, 2011 $50,000 payment.

[*152] abatement argument.[60]  Goldberg's third argument was that he should not

be liable for interest because it accrued during the 13 months that the IRS took to

process his Form 843, on which he submitted his claim for interest abatement.

The allegations in the Form 12153 correspond with the allegations Goldberg

raised on remand for Period 22 in the 2004 Abatement Schedule.[61]

Goldberg had a telephone CDP conference on January 10, 2013, with

Appeals Officer Marcus S. Morgan.

During the four months between the date of the CDP conference and the

date that the Office of Appeals sent Goldberg the notice of determination, Morgan

and his manager gathered additional information, worked with other team

members to draw legal conclusions, and determined what had happened to

---

[60]On the basis of these arguments, Goldberg sought a refund of all payments made on his joint liability for 2004, additional refund moneys credited to his account, and that the lien be "voided and recalled".

[61]The Form 12153 stated that Goldberg had "filed the [Form] 843 * * * in September of 2011.  The * * * [Goldbergs] received several letters from [the IRS's] collections [unit] stating over and over that it needed more time to process * * * [Goldberg's] request."  And in "October 2012, almost 13 months later * * * [Goldberg's Form] 843 was answered by Ms. Lindsay O'Neil, Interest Abatement Coordinator".

The 2004 Abatement Schedule's allegation for Period 22 was that there was a "delay in processing [the] claim for [a]batement".  The claim for abatement referred to in the 2004 Abatement Schedule is the claim made on the Form 843 in September 2011, which Goldberg refers to in the Form 12153.

[*153] Goldberg's Form 843. Morgan documented spending 11.75 hours on Goldberg's claim during this four-month period and a total of 15.25 hours from the date Goldberg filed his Form 12153 to when the notice of determination was issued.

### e.  Notice of determination

More than four months after the CDP conference, on May 28, 2013, the Office of Appeals issued Goldberg a Notice of Determination Concerning Collection Action(s) Under Section 6320 and/or 6330. The Office of Appeals denied relief on all of Goldberg's claims raised in his Form 12153.

Though it is not entirely clear, the Office of Appeals seems to have determined that Goldberg's receipt of Letter 1058, "Final Notice of Intent to Levy and Notice of Your Right to a Hearing", constituted a prior opportunity to challenge the underlying tax (both the underpayment and interest liability), and therefore section 6330(c)(2)(B) prohibited Goldberg from raising these challenges again in this CDP hearing.

The Office of Appeals also rejected Goldberg's argument that the May 2011 Form 4549 constituted a binding contract. It stated that the "IRS has the authority to correct computational errors on a report", citing Clark v. Commissioner, T.C. Memo. 1957-129, aff'd in part, rev'd in part, 266 F.2d 698 (9th Cir. 1959). It

[*154] seems that the Office of Appeals determined that the report (i.e., the May 2011 Form 4549) was not conclusive as to Goldberg's liability for interest.

The notice of determination briefly touched on Goldberg's request for interest abatement, which was one of the claims made on the Form 843 (and the Form 12153). The notice of determination stated that Goldberg had "really filed an abatement of tax claim (as confirmed by reviewing the form). The interest-abatement unit confirmed that they closed the case because the abatement of interest was not at issue." Though it is not entirely clear what the Office of Appeals meant by that statement, it seems to have denied Goldberg's interest-abatement claim without considering the actual merits of the interest-abatement arguments Goldberg made on the Form 843 (and the Form 12153).

After receiving the notice of determination, Goldberg spoke with a member of the IRS's Taxpayer Advocate Service, who raised the possibility of Goldberg's filing a petition in this Court. Goldberg did so on June 26, 2013, the last day of this period, Period 22. As discussed supra part I, pp. 27-28, we remanded this case to the Office of Appeals to determine whether Goldberg was entitled to interest abatement. As explained supra part I, pp. 30-32, first the interest- abatement coordinator (O'Neil), then the Appeals officer (Keen), reviewed Goldberg's entitlement to interest abatement for this period, Period 22.

**[*155]**      3.      <u>Analysis and holding</u>

We uphold the IRS's denial of interest abatement for this period, Period 22. The Office of Appeals denied interest abatement for this period because at the time both the interest-abatement coordinator and the Appeals officer examined the Goldbergs' account transcript, it showed that their account balance was zero. The Goldbergs' account transcript is in the record, and we see that it showed that as of August 1, 2011, their account balance was zero. Because the account balance showed that the Goldbergs owed no tax (it had a $0 balance), no interest was accruing for any period after August 1, 2011.[62] Thus, they determined, there was no interest to abate. This conclusion was correct in the light of the information available to O'Neil and Keen at the time they drew their conclusions.

At the time both the interest-abatement coordinator and the Appeals officer examined the Goldbergs' IRS account transcript, their conclusions were correct. The IRS had erroneously credited the Goldbergs' account, bringing their balance

---

[62]Sec. 6404(e)(1) allows the IRS to abate assessed interest. The record does not show that interest was assessed during Period 22. The record shows that August 1, 2011 was the only date that interest had been assessed for the Goldbergs' 2004 tax year. Period 22 spans August 24, 2011, to June 26, 2013. We need not determine whether interest was assessed for the interest that accrued during Period 22 because Goldberg would not be entitled to interest abatement for this period for reasons we explain <u>infra</u>.

[*156] down to zero. However, after this erroneous credit had been removed, interest again began to accrue on the positive balance.

The Office of Appeals' reasoning for denying interest abatement during this period relied on inaccurate facts. Because of that, Period 22 presents two issues that we must address: (1) whether a further remand to Appeals is necessary to determine Goldberg's entitlement to interest abatement using the corrected account transcript and (2) if remand is unnecessary, whether Goldberg is entitled to interest abatement under section 6404(e)(1).

### a. Whether remand is appropriate

We will remand a case to the Office of Appeals for a supplemental hearing if remand would be "necessary or productive". Lunsford v. Commissioner, 117 T.C. at 189. If the taxpayer has already had a proper opportunity for a hearing and the record is sufficient to allow this Court to evaluate the merits of the claim, then remand is neither necessary nor productive. Id.; see also Rivas v. Commissioner, at *9-*12. We also do not remand where the IRS's error is harmless. E.g., Watchman v. Commissioner, T.C. Memo. 2012-113, slip op. at 15-16.

An error is harmless "when it causes no prejudice or does not affect the ultimate determination in the case." Id., slip op. at 15. An Appeals officer's failure to consider an aspect of a taxpayer's argument does not prejudice the

**[\*157]** taxpayer if the argument would not have provided some basis for relief. Perkins v. Commissioner, 129 T.C. at 69-71; see also West v. Commissioner, T.C. Memo. 2010-250, slip op. at 22-24, aff'd mem., No. 11-1008 (1st Cir. Oct. 3, 2011). Because such a failing is inconsequential, a harmless error "does not give rise to an abuse of discretion." Watchman v. Commissioner, slip op. at 16.

We decline to remand Goldberg's claim for Period 22 to the Office of Appeals for further consideration. A remand is not necessary, nor would it be productive, because Goldberg has had a full opportunity for both the Office of Appeals and this Court to hear his claim, and we are able to decide the merits of the issue on the basis of the corrected information in the record.

Furthermore, as we explain infra, Goldberg was not prejudiced by the IRS's reliance on inaccurate information because Goldberg's arguments for interest abatement for Period 22 would not have entitled him to relief under section 6404(e)(1).[63] Because the IRS's mistake did not prejudice Goldberg, it was a harmless error, not an abuse of discretion.

---

[63]Under either an abuse-of-discretion or a de novo standard of review, we uphold the Office of Appeals' determination to deny interest abatement for Period 22. The standard of review for this period does not affect our holding.

**[*158]**         b.         <u>Whether Goldberg is entitled to interest abatement</u>

Goldberg is not entitled to interest abatement for the time between his mailing in his Form 843 and his filing a petition in this Court.

Goldberg argued that abatement should be granted for this period, alleging there was a "delay in processing [his] claim" for interest abatement that was not resolved "until [his] court petition [was] filed". We understand that statement to mean that Goldberg would have paid whatever interest was due once the IRS had issued him a determination on the interest-abatement claims in his Form 843, "Claim for Refund and Request for Abatement". Framing this in the terms of section 6404(e)(1), Goldberg argues that the IRS's delay in ruling on the substance of his Form 843 claim caused interest to accrue during Period 22. We disagree. The IRS did not cause him to delay paying the balance of the interest due.

Though Goldberg seeks interest abatement from August 24, 2011, through June 26, 2013, he filed his claim for interest abatement on or about September 9, 2011. Because there could not have been a delay in processing his Form 843 before the IRS had even received it, we deny interest abatement for interest that accrued before the IRS received Goldberg's Form 843. For different reasons, which we explain <u>infra</u>, we deny him interest abatement for the remainder of Period 22.

[*159] On brief, Goldberg argues that Bucaro v. Commissioner, T.C. Memo. 2009-247, entitles him to relief during the period in which the IRS delayed processing his Form 843. In Bucaro, we granted interest abatement for the period between the date the taxpayer filed his Form 843 claim for interest abatement and the date an IRS employee was assigned to process the taxpayer's claim. Id., slip op. at 31. We found that the record lacked any credible evidence to explain the "complete institutional silence" that occurred during the more than yearlong period between when the taxpayer filed his Form 843 and when the IRS finally acted on it. Id. The Bucaro fact pattern looks similar to some of the facts we have found here during Period 22. However, there is one dispositive distinction between Bucaro and Goldberg: Bucaro had paid all of the interest in dispute a few months before he filed his petition with this Court. Id. at 19; Petition, Bucaro v. Commissioner, T.C. Memo. 2009-247 (No. 17659-07). Goldberg did not and, as of the date of trial, had not remitted payment for the interest in dispute.

The IRS may abate the portion of interest "attributable in whole or in part to" the IRS's "unreasonable error or delay" (in performing a managerial or ministerial act). Sec. 6404(e)(1). We reiterate that "attributable to" means "due to, caused by, or generated by." Lawinger v. Commissioner, 103 T.C. at 435. Thus, abatement of a portion of interest under section 6404(e)(1) requires a

[*160] showing that the IRS has caused that portion of interest to accrue.  Braun v. Commissioner, slip op. at 15; see also Palihnich v. Commissioner, T.C. Memo. 2003-297, slip op. at 12.

In general, interest on an underpayment for a tax year stops accruing when the taxpayer has fully paid the balance due for that year.[64]  See sec. 6601(a); see also Larkin v. Commissioner, T.C. Memo. 2014-195, at *18-*23, aff'd, 626 F. App'x 813 (11th Cir. 2015).  The sooner a taxpayer pays his or her liability, the less interest accrues on that liability.  Cf. sec. 6622(a).  We have granted interest abatement to taxpayers in cases where the IRS had made an unreasonable error or delay that prevents the taxpayer from conclusively knowing the amount of liability due.  E.g., Hancock v. Commissioner, T.C. Memo. 2012-31; Bucaro v. Commissioner, T.C. Memo. 2009-247.  However, we have done so only when the taxpayer has "show[n] that * * * [he] would have paid his * * * tax liability earlier but for" the IRS's unreasonable error or delay.  Foote v. Commissioner, at *15; see, e.g., Hancock v. Commissioner, slip op. at 14-15; Bucaro v. Commissioner, slip op. at 12-15; Douponce v. Commissioner, T.C. Memo. 1999-398, slip op. at 6-7.  If the taxpayer would not have paid the liability earlier, the IRS's unreasonable error or delay could not have delayed payment, and thus could not

_____

[64]A third party might also pay the balance.

[*161] have caused "in whole or in part" the accrual of interest.  See sec. 6404(e)(1).

For this period, Period 22, Goldberg essentially argues that the IRS's delay in processing his Form 843 prevented him from knowing how much interest he owed, causing him to delay payment and thus causing further interest to accrue. Goldberg relies on Bucaro to argue that had the IRS conclusively determined his entitlement to interest abatement sooner, he would have known how much he owed.  However, unlike the petitioner in Bucaro, Goldberg has not shown that he would have paid the interest accruing on his tax liability but for the IRS's failure to process his Form 843.  At trial, IRS counsel asked Goldberg whether he had the "financial means to pay" the approximately $17,000 in interest when he "received the bill" for it in August 2011.[65]  Goldberg testified:  "I can't answer that.  I don't know if at that point in my life I did or didn't."  When IRS counsel asked other questions about Goldberg's ability to pay the interest at the time, Goldberg's testimony was also equivocal.  Furthermore, the record does not contain any documentary evidence that Goldberg was able to pay the interest due at the time he submitted the Form 843.

---

[65]See supra part III.II, p. 146 (Period 21), which discusses the August 1, 2011 assessment and mailing of the CP 22 notice.

**[\*162]** Goldberg has the burden of proof on all issues, see Rule 142(a), and he has failed to prove that he would have paid the interest due but for the IRS's alleged unreasonable error or delay in processing his Form 843. Thus, the interest was not attributable to the IRS's unreasonable error or delay in performing a managerial or ministerial act and is thus not abateable under section 6404(e)(1).

The interest that accrued during Period 22 is not attributable to any action of the IRS. Therefore, Goldberg is not entitled to relief under section 6404(e)(1).

## IV.   Conclusion

In conclusion, we sustain the notice of determination, as supplemented by the supplemental notice of determination, with the exception of Period 21, for which the IRS conceded Goldberg was entitled to interest abatement. Our determination to sustain the notice of determination, as supplemented, except for Period 21, includes a determination that the Office of Appeals did not abuse its discretion in denying interest abatement for Periods 1-20 and Period 22. For the sake of clarity, the following table details each period for which the Office of Appeals denied interest abatement and for which we sustain the denial.

[*163]

| Period number | Date period begins | Date period ends | Number of days |
|---|---|---|---|
| Period 1 | 9/12/2007 | 9/20/2007 | 9 |
| Period 2 | 9/20/2007 | 9/27/2007 | 8 |
| Period 3 | 12/1/2007 | 1/31/2008 | 62 |
| Period 4 | 1/31/2008 | 3/11/2008 | 41 |
| Period 5 | 3/11/2008 | 4/28/2008 | 49 |
| Period 6 | 7/18/2008 | 7/30/2008 | 13 |
| Period 7 | 8/8/2008 | 8/16/2008 | 9 |
| Period 8 | 8/27/2008 | 9/4/2008 | 9 |
| Period 9 | 9/4/2008 | 9/22/2008 | 19 |
| Period 10 | 9/23/2008 | 9/25/2008 | 3 |
| Period 11 | 9/29/2008 | 11/13/2008 | 46 |
| Period 12 | 5/29/2009 | 6/8/2009 | 11 |
| Period 13 | 6/10/2009 | 6/15/2009 | 6 |
| Period 14 | 6/20/2009 | 7/27/2009 | 38 |
| Period 15 | 7/27/2009 | 8/9/2010 | 379 |
| Period 16 | 11/15/2010 | 12/8/2010 | 24 |
| Period 17 | 12/8/2010 | 1/3/2011 | 27 |
| Period 18 | 1/7/2011 | 1/10/2011 | 4 |
| Period 19 | 1/13/2011 | 2/15/2011 | 34 |
| Period 20 | 3/29/2011 | 4/15/2011 | 18 |
| Period 22 | 8/24/2011 | 6/26/2013 | 673 |

An appropriate decision will be

entered.